Stuart A. Courtis and Margaret A. Courtis v. Commissioner.
Courtis v. Commissioner
Docket No. 56117.
United States Tax Court
T.C. Memo 1957-107; 1957 Tax Ct. Memo LEXIS 143; 16 T.C.M. (CCH) 443; T.C.M. (RIA) 57107; June 27, 1957
*143 Sections 42 and 111(b), 1939 Code: Equivalent of cash-amount realized: Cash basis. - Petitioner conveyed her undivided interest in a tract of unimproved real estate to her son and another in 1949 in exchange for their note made payable about two years thereafter. The note was unsecured, non-negotiable, and did not bear interest. There was no written contract relating to the conveyance. The note has never been paid, either in part or in full. Held, that the note was not the equivalent of cash, and petitioner did not realize income in 1949 upon her exchange of a deed for the note. Ralph W. Barbier, Esq., Guardian Building, Detroit, Mich., for the petitioners. Robert J. Fetterman, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for 1949 and 1950 in the amounts of $5,521.58 and $1,221.94, respectively. Petitioners do not contest the deficiency for 1950. They do not contest some of the adjustments for 1949. The only issue is whether petitioner, Margaret A. Courtis, realized net capital gain in 1949 upon the sale of her undivided interest in real estate, as the respondent has determined. The first question *144 is whether the face amount of a non-negotiable note, $72,000, received in 1949 by Margaret A. Courtis for the sale of her interest in real estate, constituted an "amount realized" in that year within the meaning of section 111, 1939 Code. If that question is decided for the respondent, a second question must be considered, whether Margaret A. Courtis is entitled to treat the sale of her interest as an installment sale under section 44(b). Findings of Fact The petitioners are residents of Detroit, Michigan. They filed a joint return for 1949 with the collector of internal revenue for the district of Michigan. Petitioners report their income on the cash basis. The issue relates only to Margaret A. Courtis; she is referred to hereinafter as the petitioner. She is over 82 years old. On February 25, 1949 and prior thereto, the petitioner, her children, her sisters, and various children owned undivided interests in unimproved real estate located in Detroit, which is hereinafter referred to as the Jefferson property. They had acquired their interests by gift or inheritance. Their respective interests were as follows: Margaret A. Courtis
12/45ths
Thomas M. Courtis children of petitioner
1/45th
Walter F. Courtis
1/45th
Joseph W. Courtis
1/45th
Ruth W. Prescott sister of petitioner
12/45ths
Jane W. Dolese sister of petitioner
12/45ths
Joel H. Prescott children of Ruth W. Prescott
1/45th
Mary Elizabeth Prescott
1/45th
David B. Dolese children of Jane W. Dolese
1/45th
Roger M. Dolese
1/45th
Margaret Dolese Brown
1/45th
Mary Dolese Courtis
1/45th
45/45ths
Ruth *145 W. Prescott and her children, Joel and Mary Elizabeth, are referred to hereinafter as the Prescotts. Janes W. Dolese and her three children, David, Roger, and Margaret D. Brown, are referred to hereinafter as the Doleses. Mary Dolese Courtis, a daughter of Jane W. Dolese, is the wife of petitioner's son, Thomas M. Courtis. On February 25, 1949, the Jefferson property had a frontage of 350 feet on East Jefferson Avenue, a main arterial street in Detroit, and extended 1,800 feet in depth to the Detroit River. The property is situated in a very fine location on the east side of Detroit. Late in 1948, Thomas M. Courtis, hereinafter referred to as Thomas, petitioner's son, entered into a joint venture with Fred Scheuenstuhl, hereinafter referred to as Fred, for the purpose of acquiring the Jefferson property and improving it with apartment buildings. Thomas was engaged in the real estate business. Fred was an established builder. In the early part of 1949, Thomas offered to purchase the Jefferson property for $270,000 on the basis of $6,000 for each undivided 1/45th interest. An agreement was entered into by all of the owners of interests in the property and the purchasers. The agreement *146 provided that the three Prescotts were to be paid in full in cash for their interests aggregating 14/45ths; petitioner's three children, Walter, Joseph, and Thomas were to be paid in full in cash for their interests aggregating 3/45ths; the four Doleses and Thomas' wife, Mary D. Courtis, were to be paid in cash one-half of the purchase price of their respective interests, and they were to receive promissory notes for the balance; and petitioner was to receive a promissory note for the entire purchase price of her interest, $72,000. The agreement was carried out in the following way: Thomas and Fred obtained a loan to finance the agreed cash payments from Bondholders Management, Inc., under which they received cash in the net amount of $150,000, on or about February 25, 1949. The loan was secured by a mortgage on the Jefferson property. On February 25, 1949, the purchasers made payments to the sellers of interests in the Jefferson property who were to receive cash in the total amount of $150,000, and, also notes for $48,000 were given to the four Doleses and to Thomas' wife for the balance of the total sum which they were to receive. Also, a note was given to petitioner which is referred *147 to hereinafter. The consideration given to all of the sellers, except petitioner, was as follows: Seller
Interest
Cash
Note
Ruth Prescott
12/45ths
$ 72,000
None
Joel Prescott
1/45ths
6,000
None
Mary Prescott
1/45ths
6,000
None
Walter Courtis
1/45ths
6,000
None
Joseph Courtis
1/45ths
6,000
None
Thomas Courtis
1/45ths
6,000
None
Jane Dolese
12/45ths
36,000
$36,000
David Dolese
1/45ths
3,000
3,000
Roger Dolese
1/45ths
3,000
3,000
Margaret D. Brown
1/45ths
3,000
3,000
Mary D. Courtis
1/45ths
3,000
3,000
$150,000
$48,000 The notes referred to above were not notes of Thomas and Fred, however, because the Doleses were unwilling to accept their notes. The petitioner agreed to accommodate Thomas by executing her promissory notes totaling $48,000 payable to the Doleses and Thomas' wife for the balance due each of them. Accordingly, petitioner executed five promissory notes, dated February 18, 1949 payable to Jane Dolese, David Dolese, Roger Dolese, Margaret D. Brown, and Mary D. Courtis, in the face amounts of $36,000, $3,000, $3,000, $3,000, and $3,000, respectively. These notes were due on or before July 1, 1950, and bore interest at the rate of five per cent. These notes were delivered to the payees on February 25, 1949. As has been stated *148 above, petitioner was to receive in payment for her undivided 12/45ths interest, a promissory note for $72,000. Since she had given her notes for the total amount of $48,000, to accommodate Thomas and Fred, and since, also, she had made a loan to them of $420.80, the note of Thomas and Fred covered all of these items and was made in the total amount of $120,420.80. Under the general agreement, petitioner did not require the payment of interest on the obligation of Thomas and Fred to pay her $72,000, but they were to pay her five per cent if she should be required to make payment of her notes aggregating $48,000. Accordingly, on February 25, 1949, Thomas and his wife, and Fred and his wife, executed and delivered to petitioner a promissory note dated February 25, 1949, payable to petitioner, in the total face amount of $120,420.80. The note provided for payment of $48,000, plus five per cent interest, on or before July 1, 1950; and for payment of the balance, $72,420.80, without interest, on or before July 1, 1951. The note is as follows: On or before July 1, 1951, we promise to pay to Margaret A. Courtis of Detroit, Michigan, the sum of One Hundred Twenty Thousand Four Hundred Twenty *149 and 80/100 ($120,420.80), payable at Detroit, Michigan, under the following terms and conditions: Forty-eight Thousand ($48,000.00) Dollars shall be paid Margaret W. Courtis on or before July 1, 1950. This sum shall bear interest at the rate of five (5%) percent per annum. The balance of this note, or seventy-two thousand four hundred twenty and 80/100 ($72,420.80) Dollars, shall be paid on or before the date first herein designated (July 1, 1951), which said latter amount shall not bear interest. The $72,420.80 represents the balance of the purchase price in full for Margaret W. Courtis' interest in and to Lots 4, 5, 6 and 7, except the West 75 feet of the East 93 feet of the South 400 feet thereof, of Albert Crane's Plat of that part of P.C. 644, and the Eastern 53.91 feet of P.C. 723, lying South of Jefferson Avenue, Detroit, Michigan, according to plat recorded in Liber 2 of Plats, Page 28, Wayne County records. (signed) Fred Scheuenstuhl (signed) Katherine Scheuenstuhl (signed) Thomas M. Courtis (signed) Mary Maybury Dolese Courtis On February 25, 1949, in exchange for cash and notes, as above set forth, each of the sellers of undivided interests in the Jefferson property, including *150 petitioner, executed and delivered to Thomas, Fred, and their wives, warranty deeds conveying the respective, undivided interests in the Jefferson property to Thomas, Fred, and their wives, jointly. In the arrangements described above, Thomas was the active person; Fred was not. Fred did not contribute any money toward the acquisition of the Jefferson property. Thomas arranged with Bondholders Management for a loan before concluding arrangements to purchase the various interests in Jefferson property. It was understood that deeds would be obtained and Thomas and Fred would then give Bondholders a first mortgage to secure a loan of $165,000, discounted to $150,000, by Bondholders, after which Thomas would pay over to all of the owners of interests in Jefferson, except petitioner, his mother, $150,000, in proportion to their respective interests. In order to obtain the loan from Bondholders, it was necessary to have title to the entire tract of land. The arrangements for obtaining the deeds from the several owners of Jefferson tract were oral. Thomas and Fred, at the end of 1948 and the beginning of 1949, did not have enough cash to purchase the Jefferson tract. Eleven out of the twelve *151 heirs, the owners of the Jefferson tract, namely, all except petitioner, wanted to be paid in full for their interests. The Prescotts, and Walter, Joseph, and Thomas Courtis, wished to receive full payment for their interests at the time of giving their deeds to Thomas and Fred. The four Doleses and the wife of Thomas wanted to receive one-half at the time of giving their deeds and the balance one year later, or before. However, Thomas' mother, petitioner, was willing to wait for payment for her 12/45ths interest, and to help Thomas accomplish the deal. Under these arrangements Thomas was able to arrange the transfer of the complete title for the entire Jefferson tract to himself and Fred. On July 1, 1950, Thomas paid the balance due to Jane, David, and Rober Dolese, to Margaret D. Brown, and to Mary D. Courtis, which aggregated $48,000, plus interest. The accommodation notes of petitioner totalling $48,000 were thereupon cancelled and returned to petitioner. The above payments discharged the obligation to pay petitioner $48,000 under the joint note of Thomas and Fred, and their wives, dated February 25, 1949, and, accordingly, notation was made on the reverse side of the note for *152 $120,420.80 of payment of $48,000, leaving a balance due under that note of $72,420.80. As of July 1, 1950, all of the sellers of undivided interests in the Jefferson property were paid in full for the sales of such interests except petitioner. That is to say, the sellers of 33/45ths interests had received the total sum of $198,000 for their interests. As of the time of the trial of this case in 1957, no payment has been made to petitioner of any part of the purchase price of her interest in the Jefferson property, $72,000, and the balance of $72,420.80, due on the note of February 25, 1949, has remained unpaid. On July 5, 1950, Fred and his wife transferred all of their interest in the Jefferson property to Thomas and his wife. On the same date, the petitioner executed a document releasing Fred and his wife from their obligations under the note dated February 25, 1949, which she had received from Thomas, Fred, and their wives. On December 29, 1950, Thomas and his wife transferred approximately one-third of the Jefferson property to the city of Detroit as the result of a condemnation proceeding. The portion transferred fronted on the Detroit River and was approximately 400 feet in *153 depth. The consideration received from the city of Detroit was $125,000. The mortgage to Bondholders Management, Inc., was discharged on the same date. On April 21, 1952, Thomas and his wife conveyed their entire remaining interest in the Jefferson property to The Courtis Corporation, a corporation formed in 1952 by Thomas and his wife. The entire issued and outstanding stock of The Courtis Corporation has at all times been held one-half by Thomas, and one-half by his wife. On June 1, 1954, The Courtis Corporation leased a portion of the unimproved Jefferson property to One River House Co-Operative, Inc., for a term of 99 yeras at an annual rental of $14,205.60, beginning March 1, 1955. At the trial, Thomas estimated the present value of the Jefferson property, excluding the portion sold to the city of Detroit and the portion leased to One River House Co-Operative, Inc., to be approximately $600,000. The following schedule sets forth the mortgages placed on the Jefferson property from February 25, 1949 to date: Date of
Date of
Mortgagor
Mortgagees
Amount
Mortgage
Discharge
Thomas M. and
Mary M. Courtis
and Fred and
Katherine
Scheuenstuhl
Bondholders Management, Inc.
$165,000
2/25/49
12/29/50
Thomas and Mary
Bondholders Management, Inc.
27,500
1/17//51
4/17/52
Courtis
Thomas and Mary
Frank M. Donovan
100,000
5/28/51
4/21//52
Courtis
The Courtis Corp.
Gilpin Corp.
100,000
4/21/52
1/12/53
The Courtis Corp.
Marvin L. Pardee & Co.
25,000
5/19/52
1/12//53
The Courtis Corp.
Marvin L. Pardee & Co.
2,500
12/ 2/52
1/12//53
The Courtis Corp.
Atlas Finance Co.
143,000
1/12/53
2/ 5/54
The Courtis Corp.
Union Building Corp.
172,000
2/ 8/54
6/ 7/55
The Courtis Corp.
Union Building Corp.
12,000
6/ 8/54
7/22/55
The Courtis Corp.
Union Building Corp.
27,900
8/ 3/54
7/22/55
The Courtis Corp.
Union Building Corp.
112,000
10/ 5/54
7/22/55
The Courtis Corp.
National Bank of Detroit
234,000
6/ 7/55
6/14/56
The Courtis Corp.
Union Building Corp.
112,000
6/ 7/55
7/22/55
The Courtis Corp.
M. L. Pardee
5,000
6/ 5/56
The Courtis Corp.
Bondholders Management, Inc. *
248,000
7/26/55
The Courtis Corp.
National Bank of Detroit**
234,512
6/14/56
*154 Petitioner reported the sale of her interest in the Jefferson property in her return for 1949. She reported a gain of $22,054.14, and gave an explanation, as follows: Selling price
$72,000.00
Acquired by gift in 1932, ap-
praised valuation
49,866.66
$22,133.34
Expense of sale, revenue stamps
79.20
$22,054.14
A note was accepted for $72,000.00 by seller. No collections on this note were made in year 1949. Above profit to be reported on installment basis. Treating the transaction in the way described above in her return for 1949, petitioner did not include any gain from the sale of her interest in the Jefferson property in income in her return for 1949. In her returns for 1950 and 1951, she gave the same explanation and did not include in income any gain from the sale. Petitioner now agrees that her cost basis for her 12/45ths interest in the Jefferson property is $50,000, rather than $49,866.66. The Commissioner determined that petitioner realized *155 in 1949, from the transaction relating to her interest in the Jefferson property, long-term capital gain in the net amount of $21,920.80, of which one-half was to be included in income, $10,960.40. In the statement attached to the deficiency notice, he gave the following explanation of his determination: "It is held that the sale of the Jefferson Avenue acreage in 1949 does not qualify as an installment sale within the meaning of Section 44 of the Internal Revenue Code of 1939; that the amount realized on the sale within the meaning of Section 111 of the Internal Revenue Code of 1939 was $72,000.00; and that the March 1, 1913 value of your interest in the acreage, which under Section 113 of the Internal Revenue Code of 1939 is your cost basis, is $50,000.00. The taxable gain on the transaction is computed as follows: "Value of cash and property re-
ceived as the selling price
$72,000.00
Less cost basis (March 1,
1913 value)
50,000.00
$22,000.00
Less expense of sale
$79.20
Total gain
$21,920.80
Portion thereof taxable -
50%
$10,960.40"
At the time in 1949 when petitioner exchanged the deed for her interest in the real estate in exchange for the note for $72,000, there was an oral understanding that *156 petitioner was willing to wait for payment until such time as would be convenient. The note did not have any readily ascertainable market value in 1949. Opinion HARRON, Judge: The Commissioner has determined that petitioner realized, under section 111, 1939 Code, [1] $72,000, in 1949, as a result of the transaction in which she gave a deed of her interest in the Jefferson property. Petitioner contends that in 1949 she realized no income from the transaction. Where property is exchanged for a note, income is realized to the extent that the fair market value of the note exceeds the *157 cost basis of the property. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462. The "amount realized," where a note is received in exchange for property, by a taxpayer who reports income on a cash basis, is the cash equivalent of the note. John B. Atkins, 9 B.T.A. 140. See, also, Regs. 111, sec. 29.41-1. [2]
Respondent's position is that petitioner, who reported her income on the cash basis, was required under sections 42, 111(a) and 111(b), to include in her 1949 income the full amount *158 of the note which she received in the face amount of $72,000, because she "realized" that amount. Petitioner points out that the note was a non-negotiable, non-interest bearing, unsecured note. She also in effect contends that in the transaction which she had with Thomas, as distinguished from the transactions of the other eleven owners of interests in the Jefferson tract, the note she received represented no more than a promise to pay $72,000 at a future time. Petitioner cites Alfred M. Bedell v. Commissioner, 30 Fed. (2d) 622, affirming 9 B.T.A. 270; Dudley T. Humphrey, 32 B.T.A. 280; and Nina J. Ennis, 17 T.C. 465; Curtis R. Andrews, 23 T.C. 1026; and Estate of Coid Hurlburt, 25 T.C. 1286. It appears that a sale of petitioner's interest was completed in 1949. In a practical sense, that seems to be true because petitioner gave Thomas and Fred a warranty deed. Thomas and Fred went into possession of the property and assumed the incidents of ownership. They placed a first mortgage on the property to secure a loan through which they obtained $150,000 with which to purchase the Jefferson tract. A purchase price of $72,000 was fixed for petitioner's interest. However, there are *159 several aspects of the arrangements which invite particular attention. Therefore, the evidence has been carefully considered in order to ascertain as nearly as possible what the true understanding was in 1949, between petitioner and Thomas and Fred, at the time she received their note. In the first place, there was no written sales agreement, or land contract, between petitioner and Thomas and Fred; all of the arrangements were oral. There was a close family relationship between petitioner and her son, Thomas. It appears from the record that petitioner owned other real estate, and that Thomas entered into other substantial real estate operations in 1949 and 1950. There is testimony that petitioner was not insistent about being paid for her interest in the Jefferson tract but was willing to wait; and that she assured Thomas that she would help him work out the deal to acquire the interests of the eleven others in the Jefferson tract. Such testimony is supported by the fact that petitioner executed notes for $48,000 payable to the Dolleses and Thomas' wife, and accepted a note for $72,000 payable about two and one-half years later, on July 1, 1951. Finally, it is a fact that up to the *160 time of the trial of this case, which was a few weeks less than 8 years after February 25, 1949, and a few months less than 6 years after the due date of the note, July 1, 1951, no payment what-soever had been made to petitioner for her interest in the Jefferson tract. Petitioner testified that she has always expected to be paid, but that her son's situation has not been good enough. Part of her testimony is as follows: "Question: You had conveyed the property, and there was nothing further to do? Answer: That was all. And I had every confidence that everything was going to go all right, and there wasn't any worry to me at all. I did it gladly, and my son always talked over every move he made with his father and myself, and we saw eye to eye. And we were all optimistic that things were going very well for all of us. Well, they didn't happen to, but they will when the time comes." There is no evidence that petitioner ever presented the note of February 25, 1949, for payment, or made demand for payment; or that The Courtis Corporation, which is owned by Thomas and his wife, and which acquired the remaining part of the Jefferson tract in 1952, has ever assumed any liability for the note *161 for $72,000. No new note to petitioner ever has been executed. At the time of the trial of this case, the statute of limitations had not yet run against collection of the note. Under all of the facts before us, and considering all of the circumstances, there is a very strong suggestion that there was, at the time in 1949 when petitioner received the note for $72,000, an oral understanding between petitioner and Thomas that the note represented a promise to make payment in the future at such time as it would be convenient for Thomas to make payment. That there was such understanding is borne out by several parts of the evidence. For example: Thomas testified that he obtained $48,000 to pay the balances due the Doleses and his wife in 1950 from a real estate corporation owned by himself and Fred. Payment of $48,000 was made to such persons on July 1, 1950. Thereafter, in December 1950, Thomas and Fred received $125,000 for the part of the tract which was taken by the city of Detroit under condemnation. None of this amount was paid to petitioner. Thomas testified that before he undertook to acquire title to all of the Jefferson property, he knew about discussions by officials of the city *162 of Detroit relative to the possibility of the city's acquiring part of the Jefferson tract. Furthermore, in May 1951, Thomas borrowed $127,500 for undisclosed purposes, none of which was paid to petitioner. In Harold W. Johnston, 14 T.C. 560, 565, 566, this Court held that a cash basis taxpayer realizes no income when he receives upon the sale of property only a promise to pay under an agreement that "merely requires future payments and no notes, mortgages, or other evidence of indebtedness such as commonly change hands in commerce, which could be recognized as the equivalent of cash to some extent, are given and accepted as part of the purchase price." We stated, further, that such kind of "a simple contract creates accounts payable by the purchasers and accounts receivable by the sellers which those two taxpayers would accrue if they were using an accrual method of accounting in reporting their income. But such an agreement to pay the balance of the purchase price in the future has no tax significance to either purchaser or seller if he is using a cash system." (Italics supplied.) It is concluded from the evidence that the petitioner and Thomas and Fred, in 1949, had an oral understanding *163 that their note of February 25, 1949, would be paid at such time in the future as might be convenient for the obligors. Even though petitioner received a note at the time she delivered the deed for her interest in the property to Thomas and Fred, the payment of the note was subject to such oral agreement; therefore, the time of payment of the note was contingent upon non-specific contingencies. Such obligation is difficult to value, and certainly is not one which is freely and easily negotiable "so that it readily passes from hand to hand in commerce." Nina J. Ennis, supra. It is concluded that when petitioner conveyed her interest in the real estate to Thomas and Fred in 1949, she did not realize "the equivalent of cash" upon receipt of their note, and, therefore, no long-term capital gain was realized in 1949. Having reached the above conclusion, it is unnecessary to consider petitioner's alternative contention that she was entitled to report income from the transaction on an installment basis, but if we were to consider that contention, it would be rejected as without merit. Decision will be entered under Rule 50. Footnotes
*. Secured by mortgage on portion of Jefferson property not leased to One River House Co-Operatives, Inc. ↩
**. Secured by mortgage on portion of Jefferson property leased to One River House Co-Operative, Inc., together with assignment of rents for 30 years.↩
1. SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. (b) Amount Realized. - The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.↩
2. Regulations 111: Sec. 29.41-1. Computation of Net Income. - Net income must be computed with respect to a fixed period. Usually that period is 12 months and is known as the taxable year. Items of income and of expenditure which as gross income and deductions are elements in the computation of net income need not be in the form of cash. It is sufficient that such items, if otherwise properly included in the computation, can be valued in terms of money. The time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such a manner as clearly reflects the taxpayer's income. * * *↩