270

ALFRED M. BEDELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7612.    Promulgated November 23, 1927.

*Lyle T. Alverson, Esq.*, for the petitioner.
*A. H. Murray, Esq.*, for the respondent.

## OPINION.

Murdock: In order to decide the net loss issue in the petitioner's favor it would be necessary for us to hold that the petitioner was regularly engaged in carrying on the business of buying, selling, exchanging and otherwise dealing in bonds, stocks, mortgages, real estate, notes, choses in action and other like property. This we can not do.

The petitioner starts with a presumption against him. To prove that he was regularly engaged in 1919 in carrying on the business of buying and selling, exchanging and otherwise dealing in bonds and stocks, he testified in a general way as to what he had done in "1919 and the several preceding years." But he never limited his testimony so that it would apply specifically to the year 1919. He said that during these years he spent about four hours on each of three or four days of each week in some broker's office; that he had large margin accounts with his brokers; that he bought and sold large blocks of various stocks, which he named; that sometimes he would buy in the morning and sell at night; that frequently he pooled his interest with others; that his purpose in buying was to sell at a profit; and that he did an active business with his brokers, whom he named. These general statements could be truthfully made even though some of them did not apply specifically to the year 1919.

It must be borne in mind that we are concerned primarily with the year 1919. It was to prove that in 1919 he was regularly engaged in this business that the testimony was offered. If it was relevant and material we must assume that all of it applied specifically to the year 1919 and not only to some part of the period "1919 and the several preceding years," and that it was offered to prove that in 1919 the petitioner did an active business with his brokers and bought and sold a considerable number of stocks and bonds.

On cross-examination he was asked to identify his income-tax return for the calendar year 1919. The return was then offered in evidence by the respondent without any objection by the petitioner. This return shows but one profitable sale of a stock or a bond during

the year. The bond sold was purchased in 1916. The profit was $97.50. No claim was made on the return that the petitioner was engaged in any business as an individual. Some interest from Liberty bonds was reported, but the petitioner never claimed that the purchase or sale of Liberty bonds had any bearing on the question before us. Eight thousand four hundred and seventy-five dollars was reported as interest on corporation bonds containing a tax-free covenant, on which a tax of 2 per cent was paid by the debtor corporation. Dividends of $300 from " Can So Ry " were reported. A loss of $254,357.95 was claimed as shown by an attached schedule a copy of which appears in our findings of fact. Twenty-eight thousand one hundred and sixty-five dollars and fifty cents was reported as cash or stock dividends from corporations taxable by the United States upon a portion of their net incomes. The petitioner also testified on cross-examination that the stocks and bonds shown on the schedule attached to the return were owned by him on March 1, 1913, and were turned over by him to the Bank of Manhattan, which sold them for his account.

It seems to us that the facts thus developed on cross-examination seriously challenge the direct testimony of the petitioner in regard to his 1919 stock and bond purchases and sales. If in 1919 he was doing an active business with brokers, if he was buying and selling stocks and bonds, where is this reflected in his return? The sales at a loss were all made through a bank. These securities had all been held for six years at least. The one profitable sale was of a bond purchased in 1916. The purchase of stocks and bonds in 1919 might be reflected in the amount of interest and dividends reported, it is true. But no attempt was made to explain the apparent inconsistency between his testimony and his return. He did not mention one specific purchase or sale of stocks or bonds made by him during the year. The only other witness did not give any more satisfactory testimony on this point. The petitioner has not sustained his burden, his proof on this point is not convincing and fails to give us sufficient justification for changing the Commissioner's determination.

We are only concerned with the year 1919 in so far as it may affect the petitioner's tax liability for the year 1920, which alone is before us. Having decided that the petitioner has failed to prove facts entitling him to a favorable decision on the question of whether or not he was in 1919 regularly engaged in carrying on the business of buying, selling, exchanging and otherwise dealing in bonds and stocks, we need not discuss or decide the same question in regard to mortgages, real estate, notes, and choses in action, inasmuch as such discussion and decision would not produce any change in the petitioner's tax liability for the year 1920, in view of the facts stipulated and otherwise in evidence.

The petitioner contends that the Commissioner committed error by including a profit of $84,765.94 in the petitioner's 1920 income on account of the sale of the Morris Building; that, so far as he was concerned, the signing of the two contracts resulted in an exchange of personal property for other personal property, to wit, the legal right to compel the Valentine Building Co. to convey title to the building to the Broadway-John Street Corporation in accordance with the terms of the first contract was exchanged for the legal right to compel the White Oil Corporation to take title to the building and to pay therefor the sum of $1,075,000 in accordance with the terms of the second contract; that by reason of this exchange he received $80,000 income in the year 1919, that amount being the excess of the fair market value of the right he received over the cost of the right he gave up. In support of this contention he claims that he was a joint adventurer in these transactions with the Broadway-John Street Corporation.

There are several reasons why we can neither adopt this reasoning nor reach the conclusion that the Commissioner was in error. In the first place the evidence does not support the claim that the petitioner was a joint adventurer with the Broadway-John Street Corporation. A joint adventure can only exist where the parties to it have voluntarily agreed and intended that it should be created. *Maas* v. *Lostroff*, 194 Fed. 577; *Interstate Chemical Corporation* v. *Duke*, 163 N. Y. S. 1035. An agreement to share profits is not of itself sufficient to create the relationship. *National Surety Co.* v. *Winslow*, 143 Minn. 66; 173 N. W. 181; *Hill* v. *Curtis*, 139 N. Y. S. 428; *Haskett* v. *Stanley*, 115 N. Y. 625; 22 N. E. 745. There must be some additional fact such as control over or proprietary interest in the subject matter involved or a share in the risks and burdens incident to the transaction or transactions to be carried forward, showing that the parties intended the relationship. *Griffiths* v. *Von Horberg*, 99 Wash. 235; 169 Pac. 597. The sharing of profits may be only a measure of compensation for monies loaned to the sole adventurer. If the money is to be returned in any event or is secured against loss should not profit result, the one who advanced the money is ordinarily not a joint adventurer. *McLean* v. *City State Bank*, 210 Fed. 21. It is only when the agreement extends beyond this and makes the person a principal in the prosecution of the enterprise that he becomes a joint adventurer. *Hill* v. *Curtis, supra; Haskett* v. *Stanley, supra; Boise* v. *Jones*, 94 N. Y. S. 896; *Marston* v. *Gould*, 69 N. Y. 220; *Moscowitz* v. *Sassulsky*, 126 N. Y. S. 513.

Applying these principles to the facts proven in this case and comparing these facts with the facts in the above cases, we reach the conclusion stated at the beginning of this discussion, that the petitioner

has failed to prove that he was a joint adventurer with the Broadway-John Street Corporation. This being so, it does not follow that both had the same rights and owned the same property throughout these transactions. We do not express any opinion as to what the tax liability of the Broadway-John Street Corporation would be. As far as the tax liability of this petitioner is concerned the facts do not present a question of an exchange of property in 1919 and consequently no question of the 1919 fair market value of property received in exchange arises.

Regardless of what the petitioner's rights were under the contract between the Valentine Building Co. and the Broadway-John Street Corporation, we do not think that the signing of the agreement between the Broadway-John Street Corporation and the White Oil Corporation changed his existing rights so that under the Revenue Act he had income in 1919 as a result of these transactions. He advanced his money in consideration of an agreement which secured him against loss of that money and promised him a share of some expected profits when, as, and if there were any. He assumed no liability or responsibility and thereafter did not move in the matter. At no time in 1919 were profits assured and certainly he had no right in 1919 to move so that a share in the specific funds from the contract between the Broadway-John Street Corporation and the White Oil Corporation might be assured for himself. Immediately after this contract was signed he had the same rights and owned the same thing as previously. His rights may have increased in value as a result of the signing of this second contract because thereafter profits were more reasonably to be expected, but neither a mere increase in value nor a fictitious or paper profit is income which was intended to be taxed. *Eisner v. Macomber*, 252 U. S. 189; *Appeal of James P. McKenna*, 1 B. T. A. 326.

The facts leave us in considerable doubt as to another step in the petitioner's reasoning, which we think is important although we have decided the case as if the step had been satisfactorily proven. The petitioner had his agreement with Elias R. Cohen, an individual, whereas a corporation made the contract for the purchase and sale of the building. We do not know that this corporation ever authorized Cohen to contract in regard to its expected profits and if it never authorized him to contract, we do not understand how the agreement between Cohen and the petitioner in any way affected the profits which the corporation actually received in 1920. This agreement mentions 50 per cent of the profits as the petitioner's share. The petitioner has mentioned 40 per cent, 45 per cent, and 50 per cent of the profits as being his share. The result is that we are not sure that we know what contract controlled the division of these profits,

The determination of the Commissioner, holding that the sum of $84,765.94 received by the petitioner in 1920 as his share of the profits resulting from the transactions involving this building was income to him in 1920, is approved.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

LITTLETON did not participate.