E. R. SOVEREIGN AND PHYLLIS E. SOVEREIGN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61349, 70828. Filed September 30, 1959.

*Louis L. Meldman, Esq.,* for the petitioners.
*Thomas J. Donnelly, Jr., Esq.,* for the respondent.

PIERCE, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 61349 | 1951 | $780. 96 |
| | 1952 | 1, 175. 92 |
| | 1953 | 1, 170. 42 |
| 70828 | 1954 | 1, 159. 52 |
| | 1955 | 309. 78 |

The cases were consolidated for trial.

The sole issue for decision is whether certain unimproved building lots, title to which was held in the name of the principal petitioner's wife, qualify as "real property used in the [principal petitioner's] trade or business," within the meaning of section 117(j) of the 1939 Code and section 1231(b)(1) of the 1954 Code, so as to cause the gains from the sales of such lots to be entitled to capital gains treatment.

## FINDINGS OF FACT.

Certain facts have been stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference.

The petitioners, E. R. Sovereign and Phyllis E. Sovereign, are husband and wife residing in Wauwatosa, Wisconsin. They filed joint income tax returns for all years involved, with the collector or director of internal revenue at Milwaukee, Wisconsin.

Petitioner E. R. Sovereign (hereinafter called Sovereign) was, during all the taxable years, a duly licensed real estate broker, and also an experienced appraiser of real estate. He had operated in those capacities in the City and in the County of Milwaukee, for more than 30 years. He described himself on his letterhead and in his advertising, as "The Lot Specialist."

Sovereign's principal sources of income as reported on his returns for the years involved, were: Compensation for services paid by a building and loan association, and by a real estate company; profits derived from a real estate brokerage business which he operated as a sole proprietor; and rents from two residential properties. During the 5-year period here involved, he received gross commissions as a broker on approximately 600 sales of lots, in the following amounts:

| | | | |
|---|---|---|---|
| 1951 | $7, 413. 37 | 1954 | $18, 768. 67 |
| 1952 | 10, 544. 53 | 1955 | 3, 999. 46 |
| 1953 | 5, 434. 22 | | |

From these gross commissions, he deducted on his income tax returns various operating expenses. Among these current expenses were amounts for advertising and for signs, as follows:

| | | | |
|---|---|---|---|
| 1951 | $760. 99 | 1954 | $390. 04 |
| 1952 | 886. 27 | 1955 | 84. 64 |
| 1953 | 86. 30 | | |

During the taxable years involved, Sovereign handled, in 23 separate transactions, the sale of 35 unimproved building lots, the title to all of which was held in the name of his wife. These particular lots are the ones which give rise to the sole issue here presented; and they also are the lots which Sovereign claims were "real property used in * * * [his] trade or business." The facts pertaining to the acquisition, the use, and the sale of these lots are as follows:

(A) *Lots claimed to have been used for advertising.*—Sovereign at various times acted as the authorized broker for the City of Milwaukee and for the County of Milwaukee, in connection with the sale by these public bodies of a considerable number of unimproved building lots. He regarded it to be helpful in selling these lots, to place "For Sale" signs thereon, which bore his name and telephone number; but neither said city nor said county would permit such signs to be placed on any properties owned by them. Sovereign thereupon caused several of these publicly owned lots to be acquired in the name of his wife, and caused the title to be conveyed to her. He in each case charged the city or county a broker's commission for having "sold the lot to Mrs. Sovereign"; and he thereafter put up signs on the lots, in accordance with the principle that she "owned the lots." The same technique also was used by Sovereign, in buying lots in the name of his wife from private owners.

On the lots to which the wife had thus taken title, Sovereign frequently would put up a small "For Sale" sign, bearing his name, the designation "The Lot Specialist," and his telephone number; and he then would immediately superimpose on this sign a smaller card bearing the word "Sold." The purpose of his placing these "Sold" cards on the signs, was not only to stimulate sales interest in the particular tract, but also to secure listings from other property owners by indicating that he was an effective broker. After most of the adjacent lots had been sold, Sovereign would remove the "Sold" cards from the "For Sale" signs on the lots held by his wife; and he then would proceed to find a buyer for these lots, through use of the same procedures which he had employed in finding buyers for the other adjacent lots.

The propriety and legality of Sovereign's practice as a broker, in placing "Sold" cards on lots which were still being held in the name of his wife, was challenged by other real estate brokers, on the ground that it violated the Wisconsin statutes pertaining to fraudulent advertising. Sovereign, on at least three occasions, was called before the Real Estate Board. But he there successfully defended his practice, by "proving" that the owner of lots on which the "Sold" signs were placed was his wife and not himself, and that there actually had been a sale handled by him as a broker, to his wife as a third party.

(B) *Swamp lots.*—Seven of the above-mentioned 35 lots to which Sovereign's wife took title were located in a swampy area that was near other lots which Sovereign was handling as a broker. These lots had theretofore been owned by the County of Milwaukee which put them up for sale at public auction in 1951.

After these lots were acquired in the wife's name at the auction, Sovereign arranged to have them filled with earth obtained from builders who were excavating basements in the area. Sovereign put some of his above-mentioned "Sold" signs on these lots also, with a view to showing that he could sell any type of property.

Within a period of 10 months after acquisition of these lots in the name of his wife, Sovereign arranged to sell all of them at a profit of approximately 300 per cent.

(C) *Lots acquired to facilitate annexation to the City of Milwaukee.*—Eight of the 35 lots so acquired in the name of Sovereign's wife were located outside but adjacent to the corporate limits of the City of Milwaukee; and they also were near various other lots which Sovereign was handling as a broker. It was desirable that all lots in this area be annexed to the City of Milwaukee, so that water and sewer facilities would be available; but in order to effect such annexation, it was necessary that a petition be filed which would bear the signatures of a majority of the property owners in the area. With a view to obtaining such required number of signatures, Sovereign arranged for the purchase of said 8 lots in the name of his wife. He then placed "Sold" signs on these lots also.

Shortly after the area was annexed, Sovereign found buyers for these 8 lots, by using the same procedures which he used in finding buyers for the other lots which he was handling.

(D) *Low-priced lots.*—Two of the 35 lots here involved were, at the time of their acquisition in the name of Sovereign's wife, being offered for sale by the then owners at prices which were considerably lower than the prices at which Sovereign was offering other lots in the area; and he was apprehensive that these low-priced lots might be purchased by persons who would erect cheap housing and thereby damage the property values of the adjacent lots.

Following the acquisition of these 2 lots in the name of Sovereign's wife, he obtained buyers therefor by using his customary brokerage methods. One of the lots was held prior to its resale for a period of only about 4 months; and the other was held for a period of only 26 days.

---

From 75 to 80 per cent of all properties which Sovereign handled were sold to house-building contractors. He put up hundreds of signs throughout the Milwaukee area, which indicated that he was handling unimproved building lots; and builders and others upon

seeing these signs frequently would telephone him and thus provide the contact for a sale transaction. Also, he frequently took the initiative in calling builders or other persons whom he thought might be interested in buying lots, and thus established a sales contact. The foregoing applies to all lots which Sovereign handled, including the 35 lots here involved which were held in the name of his wife.

Sovereign never made any capital improvement on any of the lots involved herein, except to fill the 7 swamp lots above mentioned. Also, he never used any of said lots for any purpose, except to erect his signs thereon, and in a few cases to have his wife sign the petition for annexation to the City of Milwaukee. Sometimes, in order to increase the frontage of building sites, he would divide a lot and add a portion thereof to each of the adjoining lots.

None of the signs which Sovereign put up on the lots involved were of a permanent character. His "For Sale" signs were printed on light cardboard and tacked to a single stake driven in the ground. Some of the larger signs were supported by two stakes and braces. Smaller cards which he frequently attached to the "For Sale" signs, were likewise printed on light cardboard, and carried such statements as: "Sold"; "Lots Wanted"; "Tax Deed Lots"; and "The Answer to a Maiden's Prayer." The record does not disclose the period during which a sign was displayed on any particular lot. Often the signs would be stolen or blown down; and Sovereign would then either replace them with similar signs or remove them. He would always remove them, entirely or in part, whenever in his judgment he thought their usefulness had ended. As above stated, the cost of all such signs was deducted as a current operating expense of his brokerage proprietorship.

A summary for the 35 lots here involved, showing the lengths of the periods for which they were held in the name of Sovereign's wife prior to their sale to other parties, and showing also the number of transactions in which these lots were sold, is as follows:

| Holding periods | Number of lots (including part lots) so held | Number of transactions in which sold |
|---|---|---|
| Less than 6 months | 9 | 7 |
| More than 6 months, but less than 1 year | 21 | 11 |
| More than 1 year but less than 2 years | 2 | 2 |
| More than 2 years | 5 | 3 |

The number of the above-mentioned lots which were sold in each of the taxable years involved, was:

| Year | Number of lots (including parts lots) sold |
|---|---|
| 1951 | 10 |
| 1952 | 7 |
| 1953 | 10 |
| 1954 | 6½ |
| 1955 | 2½ |

In the joint income tax returns filed by Sovereign and his wife for the taxable years involved, the gains derived from the sales of the above-mentioned 35 lots, held in the name of the wife, were reported on a schedule (Schedule D) which bore the name of the wife only, and which indicated that she alone was the seller of such lots.

The respondent, in his notice of deficiency for the case bearing the first docket number, determined that none of said 35 lots, which were sold during the years involved in said case, constituted a capital asset within the meaning of section 117(a) of the 1939 Code, and that the gains realized from the sale thereof were taxable as ordinary income; and in his answer to the amended petition in said case, he denied that said lots constituted real property used in a trade or business within the meaning of section 117(j) of said Code. Similarly, in his notice of deficiency for the case bearing the second docket number, he determined that the gains from those of the 35 lots which were sold in 1954 and 1955 constituted ordinary income from sales of property held primarily for sale to customers in the ordinary course of business.

OPINION.

The sole issue here presented involves the applicability of section 117(j) of the 1939 Code and section 1231(b)(1) of the 1954 Code. More specifically, such question is whether the 35 unimproved building lots here involved, which were held in the name of Sovereign's wife and which are claimed to have been used in the husband's business as a broker, qualify for capital gains treatment under said statutory sections, as "real property used in the trade or business."

In the pleadings, the petitioners assigned a second alternative ground for claiming capital gains treatment, i.e.: That the properties qualified as "capital assets," within the meaning of section 117(a) of the 1939 Code and section 1221 of the 1954 Code. But at the trial, petitioner E. R. Sovereign conceded on cross-examination that the lots were never considered for investment purposes, and that "they were not investments." Also, on briefs the petitioners presented no argument in support of the applicability of said last-mentioned sections. Accordingly, we consider said alternative position to have been abandoned.

As regards the issue presented, we deem it to be significant that there is a material variance between the position taken by the petitioners in their pleadings, and the position taken by them at the trial and on briefs, as to the identity of the particular taxpayer who sold the lots and derived the gains therefrom. In their pleadings, the petitioners stated specifically and repeatedly that it was the *wife* who sold the lots and realized the profits therefrom; and that it was the *gains of the wife* which were reported by them on their joint income tax returns. However, at the trial it was stated in petitioners' open-

ing statement to the Court: "Although the title to the lots * * * was in the wife's name, he [the husband] is the party involved in the questioned transaction"; and "She [the wife] will not be involved in the trial of this case." Also, throughout petitioners' briefs it is indicated repeatedly that it was the husband (as distinguished from the wife) who acquired and held the lots, and who derived the gains therefrom. We regard such variance in position to be important. For we think that, in determining the *primary* purpose for which the property was held, and whether it qualifies as real property used in the taxpayer's business, the identity of the particular taxpayer who held the properties and who derived the gains which we are called upon to classify for tax purposes, is a matter of crucial importance.

1. If, as a matter of fact, the lots here involved actually were acquired, held, and sold by the wife—so that she is the taxpayer who derived the gains therefrom—we think that said sections 117(j) and 1231(b)(1) have no proper application in this case; and that the present issue must, as a matter of law, be decided in favor of the respondent.

The purpose of sections 117(j) and 1231 is to provide, in substance and so far as is here material, for preferential treatment to a taxpayer who has realized long-term gains or losses from sales of *his own real properties* which were held primarily for use in the operation of *his own business*. The general scheme of the sections is that, if the disposition of such properties results in a net long-term gain to the owner, he may have the advantage of capital gains treatment for such gain; but that if on the other hand such disposition results in a net loss, he may have the advantage of treating the same as an ordinary loss rather than a capital loss. This is made clear by the pertinent Treasury Regulations.[1] Thus, we regard it to be essential to the ap-

---

[1] Income Tax Regulations, relating to section 1231 of the 1954 Code:

SEC. 1.1231-1 GAINS AND LOSSES FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—(a) *In general.*—Section 1231 provides that a taxpayer's gains and losses from the disposition * * * of assets described in that section as "property used in the trade or business" * * * held for more than 6 months shall be treated as long-term capital gains and losses if the total gains exceed the total losses. If the total gains do not exceed the total losses, all such gains and losses are treated as ordinary gains and losses. * * *

(b) *Treatment of gains and losses.*—For the purpose of applying section 1231, a taxpayer must aggregate *his* recognized gains and losses from * * * [the specified types of properties].

(c) *Transactions to which section applies.*—Section 1231 applies to recognized gains and losses from the following:

(1) The sale, exchange, or involuntary conversion of property held for more than 6 months and used in *the taxpayer's* trade or business, which is either real property or is of a character subject to the allowance for depreciation * * *, and which is not—

(1). Property of a kind which would properly be includible in the inventory of *the taxpayer* if on hand at the close of the taxable year, or property *held by the taxpayer* primarily for sale to customers in the ordinary course of business; * * * [Emphasis supplied.]

The provisions of Regulations 111 and 118, relating to section 117(j) of the 1939 Code which is cognate to section 1231 of the 1954 Code, are substantially the same as the provisions above set forth, although they are somewhat less detailed.

plication of said statutory sections, that the *particular taxpayer* who sold the property and derived the gains therefrom must be the *same taxpayer* who owned the business in which said property was used prior to its sale.

The filing of a joint income tax return by a husband and wife does not eliminate said above-mentioned essential requirement, in situations where it was the *wife* alone who held and sold the property and derived the gains therefrom, and where it was the *husband* alone who owned the business in which such property was used. A husband and a wife are separate taxpayers, regardless of whether they elect to file separate returns or a single joint return. And although it is true that, for the purpose of computing the tax on a joint return, the capital gains or losses derived or sustained by either one of the taxpayers from disposition of his or her own property, may be combined with or offset against the capital gains or losses derived or sustained by the other taxpayer, it also is true that, before any such combining or offsetting is done, the classification of each particular taxpayer's gains or losses (i.e., whether they are ordinary gains or losses, or whether they are capital gains or losses) must be determined. The filing of a joint income tax return does not have the effect of converting separately owned properties of the respective taxpayers, into joint property; nor does it have the effect of converting the separate gains or losses of each taxpayer, into joint gains or joint losses.

In the instant case, there is no dispute that the business in which the several properties in question are alleged to have been used was a proprietorship of the husband, in which the wife neither participated nor had any interest. Hence, if the 35 lots here involved actually were owned by the *wife* and it was she who derived the gains from their sale, such properties do not qualify as real properties used in *her* trade or business; and the above-mentioned statutory sections are not here applicable.

Any question as to whether the properties here involved actually were owned, held, and sold by the wife, as distinguished from her husband, is a question of fact; and such question must be resolved from our examination and weighing of the entire record before us. Here, the petitioners specifically and repeatedly stated throughout all their verified pleadings that said properties were acquired, held, and sold by the wife Phyllis; and they reported the gains therefrom in their income tax returns, on separate schedules (Schedule D) which indicate that such gains were those of the wife alone. Furthermore, the husband in his testimony at the trial made various statements which support the conclusion that it was the *wife*, and not himself, who held the properties and derived the gains from their sale. For example, as shown in our Findings of Fact, the husband charged and received brokerage commissions on the lots obtained from the City

and the County of Milwaukee, on the theory that these lots had been sold by him as a broker, to his wife as a third party. Also, the husband testified that, when on three occasions he was called before the Real Estate Board on charges of fraudulent advertising resulting from his placing "Sold" signs on lots which continued to be held in the name of his wife: "I proved what I was doing, * * * I had sold the lot to Mrs. Sovereign, and * * * when I explained I did not own the lots, that Mrs. Sovereign owned the lots, I was absolutely in the clear." There is no evidence in the record, other than the self-serving implications in Sovereign's testimony to the effect that the lots were merely acquired "in the wife's name," which would tend to support any finding that the wife did not own the lots at the time of their sales, and thereby derived the gains which are here involved.

We are convinced from our examination of the entire record that all the lots here involved actually were owned, held, and sold by the wife, and not by her husband; and that it was she alone who derived the gains therefrom which we are here called upon to classify for tax purposes. And we further are convinced from our examination of the statutes that, no matter how the husband may have used his wife's properties in his separately owned proprietorship, this cannot bring into play or make applicable the provisions of the above-mentioned sections 117(j) and 1231.

For this reason alone, we think the present issue should be decided in favor of the respondent.

2. If, on the other hand, it be *assumed* that the several lots actually were acquired, held, and sold by the husband, rather than by the wife, there are other reasons why the benefits of said statutory sections 117(j) and 1231 are not here available.

First, if the 35 lots actually were acquired, held, and sold by the husband Sovereign, we think that his business activities consisted of more than merely being a broker and an appraiser; that he was engaged in the business of selling lots of his own as "a lot specialist," as well as lots owned by others; and that, within the meaning of the above-mentioned sections 117(j) and 1231(b)(1), said lots were held *primarily* for sale to customers in the ordinary course of his business.

All these lots were acquired out of groups of similar lots, which Sovereign was at the time handling in the same vicinity, and which he was making strenuous and effective efforts to sell to builders and other customers. The methods which he employed in handling and selling the lots involved embraced the same business techniques and advertising that were used in selling the other lots in said groups. Except for the filling and grading of the 7 swamp lots, no improvements or utilities were installed on any of the lots; and, even as to these swamp lots, the purpose of the filling was to facilitate their

sale at a profit, which was accomplished after a holding period of less than 10 months.

The quantity, frequency, continuity, and substantiality of the sales—the relatively short periods for which the lots were held prior to their sales—the similarity of the methods of sale to the methods commonly used by dealers in real property—and the fact that every one of the lots was sold at a profit—all tend to establish a common business pattern and to indicate that the *dominant* purpose for which the lots were acquired and held, was to produce profits through selling them to customers in the course of a continuing business.

It is true that Sovereign did put "For Sale" signs and other signs of like character on the lots for the purpose of stimulating sales interest in the localities and for showing that he was an efficient broker. But these signs were of a very temporary and transitory character. They consisted principally of printed cardboards tacked to stakes; and, whenever Sovereign thought that these signs were no longer needed, he discarded them. Such temporary use of the lots for placing advertising signs thereon, in no way changed their character; it did not constitute any general or indefinite commitment of the lots to use in Sovereign's brokerage business; and, in our opinion, it did not vary the *dominant and primary* purpose for which the lots were acquired and held—which was sale at a profit to customers.

Such temporary use of the lots for advertising was similar to the practice of a clothing merchant who temporarily takes suits from his sales racks, places them for a time in a show window or on manikins in order to stimulate sales interest, and thereafter returns them to the sales racks. In this connection, it has been decided in several cases that automobiles were held *primarily* for sale to customers in a dealer's business, notwithstanding that they were temporarily committed to uses incidental to such business. *Duval Motors Co.*, 28 T.C. 42, affd. 264 F. 2d 548 (C.A. 5); *Johnson-McReynolds Chevrolet Corporation*, 27 T.C. 300; *W. R. Stephens Co.* v. *Commissioner*, 199 F. 2d 665 (C.A. 8), affirming a Memorandum Opinion of this Court.

The Supreme Court, in *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52, said:

But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet* v. *Harmel*, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." *Burnet* v. *Harmel*, 287 U.S., at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be

narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. * * *

We are impelled to conclude from our examination and weighing of all the evidence, that the petitioners have not proved that they are entitled to the preferential treatment which they seek. We hold on the basis of the record herein, that the *dominant and primary* (although not exclusive) purpose for which the 35 unimproved building lots here involved were acquired and held, was to derive profits from their ultimate sale to customers in the ordinary course of business. And we think the same is true irrespective of whether the lots actually were held by the wife, and sold on her behalf by the husband as a broker, or whether they were both held and sold by the husband as the owner thereof.

We sustain the Commissioner's determinations, and hold that the gain derived from each of said lots is taxable as ordinary income.

*Decisions will be entered for the respondent.*

