# 996

ROBERT L. ADAM AND JUDITH W. ADAM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4192–71, 8092–71. Filed September 27, 1973.

*Bruce A. Coggeshall,* for the petitioners.
*John O. Tannenbaum,* for the respondent.

SIMPSON, *Judge:* The respondent determined the following deficiencies in the petitioners' Federal income taxes:

| Docket No. | Year | Deficiency |
|---|---|---|
| 4192–71 | 1967 | $1, 541. 11 |
| 8092–71 | 1968 | 7, 983. 24 |
| 8092–71 | 1969 | 8, 320. 39 |

The issue for decision is whether certain sales of property by Robert L. Adam were sales of property held primarily for sale to customers in the ordinary course of his trade or business.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Robert L. Adam and Judith W. Adam, husband and wife, resided in Falmouth, Maine, at the time of filing their petitions herein. They filed their joint Federal income tax returns for the taxable years 1967, 1968, and 1969 with the district director of internal revenue, Augusta, Maine.

During 1967, 1968, and 1969, Mr. Adam was a certified public accountant and managing partner of the Portland, Maine, office of Peat, Marwick, Mitchell & Co. (Peat, Marwick). He worked 40 to 60 hours a week at Peat, Marwick and often went to the office on Saturdays. From his accounting practice, he earned $86,505.04 in 1967, $104,017.94 in 1968, and $95,366.68 in 1969.

During the 1960's, Maine coastal properties were rapidly appreciating in value, and Mr. Adam became interested in the possibility of participating in their growth. He purchased the properties anticipating that they would appreciate in value and intending to resell them when he could make a satisfactory profit on the transactions. From 1966 through 1969, he engaged in the following transactions:

| Parcel | Acquisition date | Acquisition price | Sale date | Sales price | Gain | Petitioner's share of gain |
|---|---|---|---|---|---|---|
| 1. Gouldsboro | 2/4/66 | $3,043.22 | 6/21/67 | $12,500 | $9,456.78 | $4,728.39 |
| 2. Ilseboro Pond | 10/18/67 | 27,669.30 | 2/28/68 | 37,500 | 9,830.70 | 4,915.35 |
| 3. Brys Farm | 9/15/67 | 13,486.50 | 7/15/68 | 24,000 | 10,513.50 | 5,256.75 |
| 4. Ilseboro Bishop | 1/15/68 | 26,610.65 | 11/14/68 | 45,000 | 18,389.35 | 9,194.68 |
| 5. Deer Isle | 8/22/67 | 11,666.45 | 12/20/68 | 19,000 | 7,333.55 | 3,666.78 |
| 6. Granger Pond | 9/29/66 | 10,900.00 | 8/2/68 | 13,500 | 2,600.00 | 2,600.00 |
| 7. Hiram | 9/68 | 35,544.63 | 8/26/69 | 45,000 | 9,455.37 | 4,727.69 |
| 8. Winter Harbor | 12/20/68 | 50,258.84 | 7/9/69 | 86,500 | 36,241.16 | 18,120.58 |
| 9. Rogue Bluffs | 6/18/68 | 12,880.48 | 8/8/69 | 22,000 | 9,119.52 | 4,559.76 |
| 10. Castine (install-ment sale) | 9/4/69 | 66,528.54 | 10/22/69 | 100,000 | 33,471.46 | 17,735.73 |
| 11. Coburn | 11/1/68 | 61,110.00 | | | | |
| 12. Scarboro | 11/1/69 | 38,000.00 | | | | |

In 1968, Mr. Adam incurred at least $4,950 in brokers' fees. The respondent has conceded that the Hiram property was a capital asset in his hands, and consequently, it is excluded from consideration. The Coburn and Scarboro properties were still owned by him at the end of 1969.

All of the properties which Mr. Adam sold were unimproved waterfront properties marketable for development. The two properties which he purchased but had not sold by the end of 1969 were located inland; one was developed when Mr. Adam acquired it, and the other was zoned industrial and commercial. All, except two, were fairly large pieces of property; the largest was 150 acres, the average size was approximately 50 acres, and the smallest was 3 acres.

All of the properties were offered to Mr. Adam by third parties as potentially profitable purchases. On one occasion, he negotiated with a prior owner for the purchase of land. It was generally not necessary for Mr. Adam to clear the title of the properties he purchased. However, in at least one case, he instituted a quiet title action to extinguish a right-of-way. For some properties, he obtained rights-of-way from adjoining landowners. Mr. Adam sometimes made perimeter surveys of the properties. He did not improve, plot, or subdivide any of the waterfront properties. Each property was sold in one piece to a single purchaser. In almost every case, the purchaser either developed the land or sold to someone who did.

Mr. Adam did not hold himself out as a dealer in real estate. He was not a licensed real estate broker, was not associated with a real estate company which advertised itself as such, was not listed in the telephone book as a real estate dealer, and did not maintain a separate office in which to conduct his real estate transactions. His use of the facilities of his office at Peat, Marwick in the course of his real estate dealings was slight. A few letters concerning the real estate transactions were typed by his secretary, and he used his office telephone for some calls concerning such transactions.

Mr. Adam was able to predict which areas of Maine would appreciate within limited periods of time. As land was developed in one

part of the State, unimproved land in other sections became more desirable, and pressure for their purchase and development steadily drove their values up. As the demand for sizable, unimproved waterfront parcels was so great, potential purchasers took the initiative in seeking out landowners who might be willing to sell their properties. Consequently, landowners who wished to sell found it unnecessary to advertise to attract buyers.

Every sale Mr. Adam made was initiated by the purchaser or someone acting on his behalf. Mr. Adam never sought out or solicited prospective buyers. He never listed the properties with real estate brokers, although once or twice, he utilized brokers to aid him in disposing of the land. In four sales, Mr. Adam was required to pay brokers' fees, although the brokers were not employed by him but were acting on behalf of the purchasers. Once, a brokerage firm conducted an advertising campaign for Mr. Adam; the campaign was for a limited duration, lasting only a month in the summer of 1968. He never advertised the properties for sale, nor did he ever place signs on them indicating that they were for sale.

A real estate broker, Goodwin Wiseman, participated in various ways in eight of the nine transactions involving the waterfront properties. During the years 1966 through 1969, Mr. Wiseman was employed by a bank as a trust officer, although the amount of time he worked there decreased until it ended during that period. Mr. Wiseman also ran two real estate companies during the period. He did not solicit property owners on Mr. Adam's behalf, and prospective sellers of land, or people acting on their behalf, brought properties for sale to Mr. Wiseman because of his reputation as a real estate dealer.

Mr. Wiseman recommended to Mr. Adam properties which might appreciate substantially in value. When he made a recommendation, it was Mr. Adam, and Mr. Adam alone, who made the decision as to whether to purchase the property, and he provided all the funds for the purchases and bore all the risks of the investment. When he purchased a property recommended by Mr. Wiseman, they entered into an agreement providing that Mr. Wiseman would receive one-half of any gain realized on the subsequent sale of the property. If brokerage fees had to be paid, they were subtracted from the gain to be shared with Mr. Wiseman. He obtained the rights of way and made the perimeter surveys for Mr. Adam. Mr. Wiseman's activity on Mr. Adam's behalf did not include soliciting purchasers for Mr. Adam, although five purchasers did contact Mr. Wiseman before they got in touch with Mr. Adam.

In their Federal income tax returns for the years 1967, 1968, and 1969, the petitioners reported the income from the sales of the nine waterfront properties as capital gains. In his notices of deficiency, the

respondent determined that the gain was ordinary income under section 1221(1) of the Internal Revenue Code of 1954.

OPINION

The issue to be decided is whether Mr. Adam was engaged in a trade or business in the course of selling the nine waterfront properties.

The issue involves section 1221(1) which, in pertinent part, provides:

"capital asset" means property held by the taxpayer * * * but does not include—
    (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

*Malat v. Riddell*, 383 U.S. 569, 572 (1966), stated:

The purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" * * * and "the realization of appreciation in value accrued over a substantial period of time" * * * [Citations omitted.]

Whether the income at issue arose from the operation of a trade or business or from a series of investments is to be determined by a consideration of all the surrounding circumstances. *W. T. Thrift, Sr.*, 15 T.C. 366 (1950). Several guidelines are generally utilized in order to determine in which type of activity the taxpayer was engaged. The tests are:

(1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable year. * * * [*William B. Howell*, 57 T.C. 546, 554 (1972).]

Other factors are often considered when they may be of aid in resolving the issue. The relative amounts of income from the taxpayer's regular business and from the property transactions can be significant in certain cases. *Real Estate Corporation*, 35 T.C. 610 (1961), affd. 301 F. 2d 423 (C.A. 10, 1962), certiorari denied 371 U.S. 822 (1962), rehearing denied 371 U.S. 917 (1962). The regularity and consistency of the taxpayer's activity can also be helpful. *Boomhower* v. *United States*, 74 F. Supp. 997 (N.D. Iowa 1947).

In *James G. Hoover*, 32 T.C. 618 (1959), the taxpayer's income from his real estate dealings amounted to 9 percent, 7 percent, and 17 percent of his total income in the taxable years under consideration. In holding that the taxpayer was not engaged in a business, the Court stated that "About the strongest factor" in his favor was the relatively small amount of income that was generated by the real estate dealings. 32 T.C. at 627. Similarly, Mr. Adam's real estate activities produced relatively little of his income. His accounting practice

yielded him $86,505.04 in 1967, $104,017.94 in 1968, and $95,366.68 in 1969. His real estate transactions produced net gains of $4,728.39 in 1967, $20,683.56 in 1968, and $40,416.07 in 1969. The net gain from his real estate activities was approximately 5 percent of his total income in 1967, 16 percent in 1968, and 30 percent in 1969. The significant difference in income generated by the two activities tends to show that Mr. Adam's real estate dealings were investment activities. *Estate of Eugene Merrick Webb*, 30 T.C. 1202 (1958).

Mr. Adam did not plot or subdivide any of his waterfront properties. He did not add any structures or facilities to them. They were sold in the same physical condition in which they were purchased. Mr. Adam made some surveys, obtained some rights-of-way, and extinguished an easement over at least one of the properties, but such activities were not significant. Further, the record clearly establishes that the properties' rise in value was traceable solely to an increase in demand for them. In this respect, Mr. Adam's activities also suggest that he was merely an investor, not a dealer in real estate. *Eline Realty Co.*, 35 T.C. 1 (1960) ; *Charles E. Mieg*, 32 T.C. 1314 (1959).

The respondent has argued that Mr. Adam's failure to improve his properties is irrelevant. It is the respondent's position that Mr. Adam was in the business of buying and selling unimproved land, and consequently, improvements were not necessary. The respondent's argument is not well taken. All aspects of a case must be considered in order to decide whether Mr. Adam was an investor or a dealer in real estate. *W. T. Thrift, Sr., supra*. His failure to do anything significant to the properties to make them more attractive to potential purchasers provides very significant proof that he was not operating a business.

In addition, Mr. Adam neither advertised nor placed "For Sale" signs on any of the properties he sold. Generally, he did not employ real estate brokers to aid him in disposing of the properties; in only one instance did a broker advertise one property for 1 month. The sales were initiated by purchasers or brokers acting on their behalf. Mr. Adam's failure to solicit sales is another indication that he held the properties as investments. *Frieda E. J. Farley*, 7 T.C. 198 (1946). Although there was a seller's market for waterfront properties in Maine at that time, and although the lack of sales activity may be less significant in a seller's market than it would be otherwise, the lack of such activities must still be considered. *Eline Realty Co., supra; Solly K. Frankenstein*, 31 T.C. 431 (1958), affd. 272 F. 2d 135 (C.A. 7, 1959), certiorari denied 362 U.S. 918 (1960). The word "business" means:

busyness; it implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation, nor take all his time. * * * It ordinarily is implied that one's own attention and effort are involved * * * [*Snell* v. *Commissioner*, 97 F. 2d 891, 892 (C.A. 5, 1938), affirming a Memorandum Opinion of this Court.]

Frequency of sales is one criterion of a business. In *Curtis Co.*, 23 T.C. 740 (1955), reversed on other grounds 232 F. 2d 167 (C.A. 3, 1956), most of the taxpayer's 18 purchases and sales were made over 4 years. In *E. R. Sovereign*, 32 T.C. 1350 (1959), affd. 281 F. 2d 830 (C.A. 7, 1960), the taxpayer sold 18 properties within a year after he purchased them and 23 within 2 years. In *J. Roland Brady*, 25 T.C. 682 (1955), the taxpayer held 7 properties for 1 year and 37 for 16 months. Although Mr. Adam purchased 11 and sold 9 properties during the 4 years from 1966 through 1969, he thereby engaged in fewer transactions than were involved in *Curtis Co.*, *Sovereign*, and *Brady*. Moreover, in most of the cases in which the Court concluded that the taxpayer was in the real estate business, relying in part on the frequency of sales, other factors were present which indicated the operation of a trade or business. *Robert W. Pointer*, 48 T.C. 906 (1967), affd. 419 F. 2d 213 (C.A. 9, 1969) ; *S. O. Bynum*, 46 T.C. 295 (1966). In no case has a court found a taxpayer to be engaged in a business when his sales were as few as Mr. Adam's and when he was not performing some activities to develop or otherwise enhance the value of the properties.

In addition, Mr. Adam's real estate transactions were intermittent and occasional.

It would seem that to carry on a business conveys the idea of progression, continuity and sustained * * * activity, and does not mean the performance of single disconnected acts. * * * The occasional purchase and resale of land by an investor speculating on a rise in real estate values, does not, in the absence of other circumstances, give rise to the status of his being a dealer in real estate. * * * [*Boomhower v. United States*, 74 F. Supp. at 1002.]

See also *Bedell v. Commissioner*, 30 F. 2d 622, 625 (C.A. 2, 1929), affirming 9 B.T.A. 270 (1927). From February to September of 1966, a period of 7 months, Mr. Adam was inactive. After one purchase in September of 1966, he had no dealings until 10 months later in June of 1967. Mr. Adam was active in the early fall of 1967, but ceased his activities in the last 3 months of that year. In 1968, there were periods of 5 and 4 months when he neither bought nor sold property. For the first 7 months of 1969, Mr. Adam was inactive ; he had several transactions in the summer and fall of that year. The size of Mr. Adam's holding was irregular, expanding and contracting sporadically. Mr. Adam made purchases only as he could find property that met his requirements ; he disposed of property only when a suitable buyer offered him a satisfactory price. He did not endeavor to maintain a constant number of properties on hand, nor did he try to steadily enlarge his holdings. Mr. Adam's conduct lacks the sustained and regular character that generally accompanies a business. Compare *Joseph M. Philbin*, 26 T.C. 1159 (1956).

Furthermore, Mr. Adam did not spend a significant amount of

time on his real estate transactions. Normal working time was devoted to his accounting practice; only occasionally did he make use of his office facilities to further his real estate interests. Mr. Adam did not maintain a separate office for his real estate dealings. He did not seek properties to purchase; would-be sellers came to him, or his agent Mr. Wiseman. The time Mr. Adam spent on selling the properties was similarly limited. It is clear that Mr. Adam made no consistent effort to publicize the properties for sale. Although a person may engage in more than one trade or business, the few real estate transactions in which Mr. Adam engaged, his irregular activity, and the small amount of time which he devoted to such transactions—all tend to show that his real estate dealings did not constitute a second trade or business for him.

The respondent relies principally on Mr. Adam's reasons for acquiring and selling waterfront properties. We have found that Mr. Adam purchased the properties anticipating that they would appreciate in value and intending to resell them when he could make a satisfactory profit on the transactions. At trial, Mr. Adam testified that the reason he purchased the properties was their potential for appreciation over a period of time. All his waterfront properties did greatly appreciate in value during the periods he owned them. Over a period of 18 months, the price of the Gouldsboro property quadrupled; the price of the Ilseboro Bishop property more than doubled in 10 months; and the price of the Castine property increased by one-half in approximately 1½ months. Deer Isle appreciated less than any other property; its price grew by one-third over 23 months. He held the waterfront properties for an average of only 11 months and sold them when he could realize a satisfactory profit.

In *William B. Howell*, 57 T.C. at 555, the Court stated:

though the property may have been acquired with the ultimate intention of reselling, this does not result in a determination that the property was held primarily for sale in the ordinary course of business. * * * property must not only have been "held primarily for sale," but also for sale in the "ordinary course of business." * * *

In that case, the taxpayer purchased a single piece of property with the avowed purpose to sell it at a profit. It was purchased in 1962; two small parcels were sold in 1964 and 1965; and the remaining 90 percent was sold in a single transaction in 1966. The Court held that "the profit arising in the instant transaction was the realization of appreciation in value accruing over a period of time; and the fact that such appreciation was anticipated and was the *raison d'etre* for the purchase does not serve to alter this basic fact." 57 T.C. at 555. Although we have said: "Acquiring and holding property with the expectation of selling as soon as a reasonable profit can be realized is

not holding for investment" in *Real Estate Corporation*, 35 T.C. at 615, such case, together with the other cases which have applied a similar principle, is distinguishable from *Howell*. In *Real Estate Corporation* and similar cases, the taxpayer was engaged in many real estate transactions, spent substantial time and effort developing the property, or derived a significant portion of their income from the real estate activities. *Frieda E. J. Farley*, 7 T.C. 198 (1946) ; compare *Curtis Co.*, 23 T.C. at 755. Although Mr. Adam engaged in a few more transactions and held the properties for somewhat shorter periods of time, such differences do not lead to a different conclusion than was reached in *Howell*.

When we weigh all the circumstances of this case, we conclude that Mr. Adam was not in the business of selling real estate. When a taxpayer buys and sells undeveloped real estate, when he performs no significant activities in purchasing, developing, or selling the properties, when he engages in only a few transactions, and those sporadically, when he devotes no substantial time to the real estate transactions and derives relatively little of his income from them, his activities resemble those of a person who invests in the stock market with the objective of buying and selling speculative stocks. Only occasional purchases and sales of real estate or stocks with the hope of realizing a gain on their subsequent increase in value, without more, does not constitute a trade or business. In our judgment, Mr. Adam was merely investing in speculative real estate properties.

The respondent has also argued that Mr. Adam and Mr. Wiseman were engaged either in a series of joint ventures, or an agency relationship, which conducted a business of buying and selling real estate, and therefore, Mr. Adam's sales were made in the course of a trade or business. We find no merit in either contention.

It is unnecessary for us to decide whether the relationship constituted a joint venture or an agency, for under either theory, a trade or business was not being operated. If Mr. Wiseman was merely acting as an agent, the acts which he performed for Mr. Adam may be attributed to Mr. Adam in judging whether his activities as a whole constituted a trade or business. *Robert W. Pointer*, 48 T.C. 906 (1967), affd. 419 F. 2d 213 (C.A. 9, 1969). However, only those acts may be attributable to Mr. Adam, and he is not to be considered to be in the trade or business merely because Mr. Wiseman was in the business of being a real estate broker. *Riddell* v. *Scales*, 406 F. 2d 210 (C.A. 9, 1969). In determining what activities were performed by Mr. Adam and whether those activities constituted a trade or business, we have already included the activities performed for him by Mr. Wiseman, and we have concluded that, even including such activities, Mr. Adam was not in the trade or business of dealing in real estate. The result

is no different if the relationship between Mr. Adam and Mr. Wiseman constituted a series of joint ventures. In that event, we must also take into consideration the activities of both Mr. Adam and Mr. Wiseman with respect to the waterfront properties acquired in the name of Mr. Adam, but we have found that such activities did not constitute the business of dealing in real estate.

*Decisions will be entered for the petitioners.*