CHARLES J. SNIDER and ANNIS SNIDER, ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Snider v. CommissionerDocket Nos. 7975-72, 8127-72, 8128-72, 8504-72.United States Tax CourtT.C. Memo 1975-111; 1975 Tax Ct. Memo LEXIS 262; 34 T.C.M. (CCH) 530; T.C.M. (RIA) 750111; April 21, 1975, Filed. Wentworth T. Durant,Ronald M. Mankoff, and Charles M. Meadows, Jr., for the petitioners. Charles L. McReynolds, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of Charles J. Snider and Annis Snider in the amounts of $ 17,621.68 and $ 2,855.90 for the calendar years 1969 and 1970, respectively; in the Federal income tax of Joe A. Snider and LaJuan Snider in the amounts of $ 30,837.73 and $ 143.54 for the calendar years 1969 and 1970, respectively; in the Federal income tax of Ronald L. Snider in the amounts of $ 20,434.52 and $ 855.13 for the calendar years 1969 and 1970, respectively; and in the Federal income tax of Elliott P. Snider and Frankie Snider in the amount of $ 37,856.61 for the calendar*263 year 1969. The only issue for our decision is whether the gains realized from certain sales of timber contracts by each of petitioners were sales of property which each of them held primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 1221, I.R.C. 1954. 2FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of their petition in this case Charles J. Snider (Charles) and Annis Snider, husband and wife, resided in Marshall, Texas. They filed their joint Federal income tax return for the calendar years 1969 and 1970 with the district director for the Southwest Regional Service Center, Austin, Texas. Joe A. Snider (Joe) and LaJuan Snider, husband and wife, at the time they filed their petition in this case resided in Marshall, Texas. They filed their joint Federal income tax returns for the calendar years 1969 and 1970 with the district director for the Southwest Regional Service Center, Austin, Texas. Ronald L. Snider (Ronald) resided in Marshall, Texas, at the time of the*264 filing of his petition in this case. He filed his individual Federal income tax returns for the calendar years 1969 and 1970 with the district director of the Southwest Regional Service Center, Austin, Texas. Elliott P. Snider (Elliott) and Frankie Snider, husband and wife, resided in Marshall, Texas, at the time of the filing of their petition in this case. They filed their joint Federal income tax return for the calendar year 1969 with the district director of the Southwest Regional Service Center, Austin, Texas. 1. General Charles and Joe are brothers and and they are cousins of Ronald and Elliott who are brothers. Marshall, Texas, is located in East Texas and is within the western section of the yellow pine timber belt by 40 to 70 miles. In this locale, it was customary for a landowner who wished to sell the trees growing upon his land to execute a "timber contract." The purchaser-grantee would usually furnish a standardized form contract which would then be completed by the parties thereto. The standardized form which was available in stationery stores in East Texas and used by petitioners in their purchase and sale of standing timber during 1968, 1969, and 1970 provided*265 as follows: TIMBER CONTRACT THE STATE OF TEXAS, COUNTY OF KNOW ALL MEN BY THESE PRESENTS, That I or we of the County of ,State of Texas, Parties of the first part for and in consideration of $ , and receipt of which is hereby acknowledged, have this day bargained, sold and conveyed its successors and assigns, parties of the second part, all of the following described timber: All merchantable timber eight inches in diameter or over at the time of cutting, growing, standing or lying on the following land situated in County, Texas, particularly described as follows: TO HAVE AND TO HOLD the said timber to the said Party of the second part, or their assigns, with whom party of the first covenants that they are seized in fee simple of the said timber, and have a good right to sell and convey the same, as herein done, that the same are free from all incumbrances, and the claims of all persons whomsoever, and will indemnify and save harmless the second party or their assigns from all loss, damage and expense, which they may sustain by reason of the failure of or controversy over the title hereby conveyed. The said *266 , its successors and assigns, are hereby given years from and after this date within which to cut and remove said timber, together with the full rights of ingress and egress, over and upon said land for the purpose of cutting and removing said timber, together with the right to construct, use, and operate on the lands aforesaid, tram roads, log roads, and other logging facilities and conveyances in removing said timber and other timber owned by the said , its successors and assigns. PARTIES OF THE FIRST PART guarantee that the boundary lines around said land are exactly as pointed out by them to the agents of the second party. Such boundary lines must be clearly visible, and if necessary shall be re-surveyed upon demand of the second party, at the expense of the grantors. PARTIES OF THE SECOND PART agree to proceed as speedily with the cutting of the timber as is consistent with the proper handling and marketing of same. And a period of years from the date hereof is allowed within which to cut said timber, and in addition, sufficient additional time is allowed to remove the products of said timber. THE PARTY OF THE FIRST PART agrees to protect said second*267 party, or their assigns, in full and complete enjoyment of all the rights granted herein, and to keep the said land, on which the timber now stands, and the timber herein, free from all tax claims, damages or liens on part of the State or County, and also to keep the title thereto in such condition as to keep said second party and his assigns from being in any manner interfered with until they or their assigns shall have reaped the full benefit of this contract in accordance with the terms and conditions, as herein set forth. IN TESTIMONY WHEREOF witness the signature of said parties of the first part, this the day of , 19 .Witness: By The usual length of time the landowner-grantor would be willing to give the grantee to cut down his trees was one to two years. However, if the grantee needed an extension of time the landowner would customarily give an extension of 6 months to 1 year for reasonable cause. Some of these extensions would be oral; others written. If the grantee failed to cut down the trees within the time allowed under the terms of the timber contract and, if any, extensions thereof, he had no contractual right to cut the*268 standing timber. A timber broker is an individual who is in the business of purchasing and selling timber contracts for profit or of finding an interested third party and negotiating the terms of a timber contract on behalf of the landowner for a commission. A broker solicits the purchase and sale of timber contracts. However, the purchase and resale of timber contracts for profit is an activity generally conducted by many people in Marshall and is not limited to people commonly known to be brokers. A timber contractor is an individual who cuts and hauls logs to a sawmill and sells them at a profit or who contracts out his services for compensation. An independent timber contractor usually has less capacity to cut and haul than a national paper company. Timber cruisers are individuals who locate an available tract of land with merchantable timber and determine the amount of timber in board feet on the tract. In 1959 petitioners formed a partnership under the name of Snider Lumber Company to operate a sawmill in Marshall, Texas, for the manufacture and sale of finished lumber. The partnership generally acquired its raw materials by purchasing timber contracts and cutting and*269 hauling the logs itself. The average distance between the tract of standing timber involved and the sawmill was 70 to 80 miles, the farthest being 120 miles. However, occasionally the partnership contracted the services of a contractor to cut and haul trees on a tract of land upon which the partnership had a timber contract and it bought logs which had been delivered to the sawmill directly from a contractor. The partnership owned equipment to cut and haul timber including power saws, dozers to build roads, skidders to drag the logs to the road, loaders to hoist the logs onto the trucks, and trucks to transport the logs to the sawmill. The partnership employed crews and truck drivers to operate the equipment. It also employed full-time cruisers and, based on their estimation of the board feet on a tract of timber that was for sale, the partnership through its cruisers offered a price and attempted to purchase a timber contract. On January 1, 1966, the partnership sold its assets to a corporation, Snider Lumber Company, Incorporated (SLC), which was wholly owned by Robert Maloney (Robert). Employing petitioners, and operating on the same premises as the partnership had, SLC conducted*270 a general lumber business of processing timber, mostly pine and some hardwood. The corporation primarily acquired its raw materials by buying timber contracts from brokers, landowners, paper companies, and petitioners, and taking its own crews and equipment to a tract, on which it had purchased a timber contract, and cutting and hauling the timber to the sawmill. However, SLC directly purchased logs from contractors who brought them to the sawmill, but it never purchased logs in this manner from petitioners. Although SLC employed cruisers and purchased timber contracts from landowners as a result of their efforts, the corporation also purchased timber contracts from third parties due to its inability to hold many timber contracts for a year or more for lack of sufficient capital and to locate tracts of timber on which it could purchase timber contracts when it had an immediate need for additional raw materials. Robert was aware that petitioners did acquire some timber contracts, but he was unconcerned insomuch as to his knowledge they did not devote any time during working hours to purchasing timber contracts. Petitioners initially approached Robert to determine if the corporation*271 wished to purchase their timber contracts. Later when the corporation's supply of raw materials was reduced below that which it needed and it could not locate enough tracts on which it could purchase timber contracts, Robert approached petitioners and on behalf of SLC solicited the purchase of their timber contracts. The amounts the corporation paid for petitioners' timber contracts were determined by Robert, based on the amount of board feet represented by the timber contracts involved, the current market price, the corporation's need for raw materials, the vagaries of negotiation, and the corporation's capacity to cut and haul trees within the remaining time specified in the timber contracts. The amount of time required to cut and haul timber on a tract of land depended on the size and terrain of the tract, the density of the trees, the weather conditions, and the availability of crews and equipment. On some occasions SLC had been able to cut and haul the trees on a tract of land within a week. The corporation produced approximately 30 million board feet annually. Although any one month's production varied due to weather and other circumstances, SLC produced approximately 2-1/2 million*272 board feet per month. In mid-1970 SLC went out of business as a result of a decline in demand for and price of its finished lumber and its investment in timber contracts at a high cost. The physical assets of the corporation were sold at public auction and purchased by a corporation owned by Ronald and Elliott. 2. CharlesCharles went to Texas Christian University for 2 years, working toward a business degree. Subsequently he worked for a lumber company in New Mexico, spent 2 years in the Marine Corps, worked for a lumber business in Colorado, was in the cattle business in Gillmer, Texas, and in late 1959 entered into a partnership d.b.a. Snider Lumber Company to manufacture lumber. In 1966 SLC purchased the partnership assets and employed Charles on a full-time basis. The usual hours of work each day were from 7 a.m. to 5:30 p.m., 5 days a week. Charles was in charge of drying, planing, and shipping. He supervised taking the cut green lumber from the sawmill and placing it into dry kilns, curing it, storing it, shipping it, and preparing invoices on it. SLC was a member of the Southern Pine Association and Charles represented the corporation in the association as part of*273 his employment and at times was an elected member of its board. Charles' duties did not involve cruising or locating tracts of timber for SLC. For his services SLC paid Charles a salary of $ 10,400 for 1969 and $ 5,400 for the first 6 or 7 months of 1970. Charles engaged in oil operations in 1969 and 1970. During 1969 Charles received no income from his oil operations, but incurred expenses of $ 1,347.81 of which $ 1,334.46 resulted from the expiration of oil leases. During 1970 Charles received $ 11.33 in oil royalty income. Charles had cattle bought for him and placed in a feed lot in Eagle Pass, Texas. This activity was conducted without Charles' active participation. During 1969 and 1970 he went to the feed lot to inspect the cattle he had purchased. However, he did not see some of the cattle that he had purchased. Charles purchased timber contracts during 1966 and afterwards. He made sales of groups of these timber contracts at least once each year and in some years three times for a period of 3 or 4 years, making his last sales in 1970. Some of these purchases and sales were made under the registered assumed name of Mike T. Reed (Reed). His profits from these sales increased*274 each year from 1966 through 1969. Charles' sales during 1969 and 1970 of previously purchased timber contracts were as follows: Charles J. Snider a/k/a Mike T. Reed (Reed)PrimaryDate ofExpirationEnteringDate ofFromToContractContractR. S. Ray, Sr.Charles4-26-684-26-69Malta B. CarrellCharles5-10-685-10-69M. E. HartleyCharles6-1-686-1-69Charles (sale of above 3SLC3-15-69(as above)contracts)Robert M. ReynoldsCharles8-30-688-30-69J. Clovis Davis 1Charles9-18-681-18-70Burl Parker 1Charles9-18-681-18-70Mr. and Mrs. O. B. WilliamsCharles9-18-681-1-70L. B. Cash 2Charles10-8-684-8-70C. C. Cash 2Charles10-8-684-8-70Mrs. M. F. Floyd 2Charles10-8-684-8-70Charles (sale of above 7SLC5-10-696-30-69contracts)1969 Profit on Sale of Timber1969 Profit on Sale of Timber ContractsContractsMrs. J. R. Calloway 3Charles10-30-684-30-70Robert A. Calloway 3Charles10-30-684-30-70James Harris, Jr., Et Al.Charles12-11-686-11-70E. D. MansingerCharles1-9-697-9-70Mrs. Bertha BellCharles1-27-691-27-70Mrs. Jim Shockey, Et Al.Charles2-12-692-12-70Mattie A. Gouldsby EstateCharles2-17-692-17-70Roy L. Taylor, Jr.Charles2-19-692-19-70W. R. BrettCharles3-11-699-11-70J. E. HerriageCharles4-16-694-16-70Mrs. Bennie BurgeCharles5-21-695-21-70Effie BoltonCharles5-9-695-9-70Reed (sale of above 12SLC1-9-70(as above butcontracts)nolater than5-31-70)H. H. Harper 4Charles7-4-697-4-70Dexter Hedjison 4Reed7-25-697-25-70Dewey HittReed7-25-697-25-70Dan McQueen, Et Al.Reed10-14-6910-14-70Reed (sale of above 4SLC4-15-706-30-70contracts)R. H. McCrary, Et Al.Reed6-8-7012-8-71Reed (sale of part of McCrarySLC6-8-706-30-70contract)Charles/Reed (sale of remainderofMcCrary contract)Romine19701970 Profit on Sale of Timber Contracts$ 34,155*275 Charles J. Snider a/k/a Mike T. Reed (Reed)ConsiderationConsiderationPaid forReceived forPurchase ofSale ofFromContractContract(s)ProfitR. S. Ray, Sr.$ 6,000Malta B. Carrell1,600M. E. Hartley1,900Charles (sale of above 3$ 32,500$ 23,000contracts)Robert M. Reynolds2,550J. Clovis Davis 12,000Burl Parker 1450Mr. and Mrs. O. B. Williams4,500L. B. Cash 2550C. C. Cash 2600Mrs. M. F. Floyd 2750Charles (sale of above 757,61046,210 contracts)1969 Profit on Sale of Timber1969 Profit on Sale of Timber$ 69,210ContractsContractsMrs. J. R. Calloway 3$ 8,600Robert A. Calloway 38,300James Harris, Jr., Et Al.2,570E. D. Mansinger9,000Mrs. Bertha Bell775Mrs. Jim Shockey, Et Al.1,800Mattie A. Gouldsby Estate800Roy L. Taylor, Jr.4,000W. R. Brett4,250J. E. Herriage1,750Mrs. Bennie Burge1,000Effie Bolton4,000Reed (sale of above 12$ 81,000034,155contracts)H. H. Harper 42,115Dexter Hedjison 4700Dewey Hitt2,300Dan McQueen, Et Al.2,500Reed (sale of above 47,6150contracts)R. H. McCrary, Et Al.1,900Reed (sale of part of McCrary1,000contract)Charles/Reed (sale of remainderofMcCrary contract)90001970 Profit on Sale of Timber Contracts$ 34,155*276 Although Charles did not have after the partnership had sold its assets the capability of cutting and hauling trees other than hiring a timber contractor, which he did not do, Charles purchased timber contracts to resell at a profit prior to expiration of the rights thereunder. Charles realized the demand for timber was increasing while the supply of timber was decreasing*277 due to the increase in the number of plywood mills in the area, industry expansion in general, the export of lumber to Japan from the West Coast beginning in the early 1960's and rising volume of industry sales. Charles' representation of SLC on the Southern Pine Association assisted him in keeping abreast of conditions affecting the industry. The market price for standing timber increased from 1966 to late 1969 and during 1969 was selling between $ 30 and $ 150 per thousand board feet. SLC paid approximately $ 70 to $ 80 per thousand board feet during 1969. The increase in the price of standing timber was more rapid than Charles had anticipated. By virtue of his having been in the lumber business as a partner in a partnership and as an employee of a corporation, both of which purchased timber contracts, and having lived in the area a long time, Charles was known of or known by landowners who wanted to sell timber and contacted Charles as a possible purchaser. Charles indirectly learned from people who knew him or of him of landowners who were possibly interested in selling their standing timber. If he knew of a landowner who was interested in selling his timber Charles sometimes*278 went to see that landowner after work or during the weekend to solicit a purchase of a timber contract, but negotiations for most of Charles' purchases were at least initially conducted on the telephone at times other than during the regular working day, generally in the evening. On numerous occasions Charles made an offer and reached an oral agreement to purchase a timber contract over the telephone based on the knowledge he had acquired during 20 years' experience in the lumber business, including his knowledge of most of the tracts in the area, of tracts of timber previously cruised by SLC which it had not purchased. The landowner then executed a timber contract based on the agreed terms at a later date. Charles generally paid the purchase price sometime after the contract was executed with a check drawn on funds borrowed from local banks. Charles never solicited nor considered soliciting buyers other than SLC. Charles was confident that he could sell his timber contracts to SLC which sometimes had to purchase timber contracts to replenish its supplies of raw materials and making sales to SLC was more convenient for him than selling to other potential buyers. Charles generally*279 did not know the specific amount of timber SLC needed at any particular time unless Robert told him, but even before his first sale to SLC Charles, knowing of the corporation's increasing use of timber cruisers, was aware of its need for some timber and was certain he could sell his timber contracts to it. To sell his timber contracts Charles initially approached Robert to inquire if the corporation wanted to buy his timber contracts. Robert made an offer which Charles accepted. Charles then executed a timber contract conveying to SLC his contractual rights under the timber contracts that he had purchased. From the time of his initial sale of timber contracts to SLC, Robert was aware that Charles had timber contracts for sale and SLC purchased them from Charles as well as from other sources as it had a need for raw materials. The price that SLC paid Charles for his timber contracts was a negotiated price. Robert did not know what Charles had paid for each timber contract and Charles did not know what Robert considered each timber contract to be worth. Insofar as Charles knew, SLC paid him no more than it paid to its other sources of supply. Charles did not maintain an office or*280 special files in connection with his purchase and sale of timber contracts. He did not subscribe to any broker publications other than those required in his capacity as an employee of SLC. Charles did not advertise that he wanted to buy timber or list himself as a broker in the telephone directory or in an industry directory. Additionally he did not undertake any activity with respect to a tract of land on which he had purchased a timber contract to improve that tract so that the timber contract would have a greater value. He never applied for a broker license nor was issued one. Further, he had no agents or employees soliciting purchases and sales of timber contracts. Charles did not attempt to purchase contiguous tracts of timber but purchased timber contracts on tracts of land as they became available and he was able to buy them. Generally the tracts on which he purchased timber contracts were not contiguous. The resale of timber contracts on tracts which were contiguous or the disposition of many timber contracts at one time to the same buyer had no inherent advantage or value. Charles acted on his own behalf in his purchase of timber contracts. His brother Joe and cousins*281 Elliott and Ronald made separate purchases of timber contracts. Charles limited his purchases of timber contracts during the latter part of 1969 and made only one such purchase in 1970. After 1970 Charles stopped purchasing timber contracts and had not purchased any such contracts after 1970 until the date of this trial on February 5, 1974. Charles foresaw as early as 1969 that the lumber business was in some difficulty and the demand for lumber was falling due to higher interest rates having an adverse effect on building. Many sawmills in the South, including SLC, were ultimately forced to close. The lumber business being depressed and the risks of the market having increased by 1970, Charles decided to sell all of his timber contracts. He sold some of his timber contracts at his cost. The one timber contract which Charles acquired in 1970 was acquired on June 8, pursuant to his previous agreement with the landowner for its purchase. Prior to making a binding commitment for the 1970 purchase, Charles discovered that SLC was about to shut down. However, having received Robert's assurance that SLC would buy this timber contract from him, Charles acquired the timber contract he had*282 agreed to purchase and conveyed a portion of his rights under it on the same day to SLC and the remainder of his contractual rights to Jean Romine at no profit to himself. Charles' timber contract sales during 1969 were, to the date of this trial, his most successful endeavor. In 1970 Charles was a partner in a partnership and a shareholder of an electing corporation which raised catfish and reported losses in an amended return for 1970 of $ 12,476.08. In 1974 Charles was engaged along with his brother Joe in the buying and selling of cattle. In their Federal income tax returns for the calendar years 1967 and 1970 Charles and Annis Snider reported the income from their sales of timber contracts as capital gains. Respondent in his notice of deficiency determined that the gain was ordinary income under section 1221(1). 3. JoeJoe, the brother of Charles and cousin of Ronald and Elliott, received a bachelor's degree in business administration from North Texas State College in 1960. Upon graduation he entered into the partnership, Snider Lumber Company, and remained a partner until the partnership terminated and its assets were sold to SLC in January 1966. Thereafter SLC*283 employed Joe on a full-time basis to supervise the purchase and maintenance of all rolling stock, including trucks, logging equipment, and yard equipment. Joe worked from 7 a.m. to 5:30 p.m., except when he was needed at other times when the repair shop was operating two shifts each day or a weekend shift. Joe's duties did not include locating timber for SLC. For his services Joe received a salary from SLC of $ 9,900.80 for 1969 and $ 5,140.80 for 1970. Believing timber contracts presented a good opportunity for appreciation, Joe bought his first timber contract in 1966 and, realizing the price of lumber was increasing due to a greater demand for lumber, continued to purchase timber contracts through 1969. In some instances Joe was able to purchase timber contracts for what he considered to be less than their market value. Having bought a timber contract and having no facilities to cut and haul timber, Joe intended to resell it just prior to its expiration under its terms so that it had an opportunity to appreciate in value. During each of the years 1966 through 1970 his sales of the timber contracts that he had bought were profitable. Joe sometimes bought and sold timber contracts*284 under his registered assumed name of Edwin L. Stone (Stone). The sale dated March 10, 1969, was his most profitable activity as of the date of this trial. Joe's sales during 1969 and 1970 of timber contracts that he had previously purchased were as follows: Joe A. Snider a/k/a Edwin L. Stone (Stone)PrimaryConsiderationConsiderationDate ofExpirationPaid forReceived forEnteringDate ofPurchase ofSale ofFromToContractContractContract(Contracts)ProfitHeimatzJoe3-17-68$ 1,420Alton Cade,Joe8-15-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,000Sr., Et Al.Joe (sale ofSLC4-1-696-1-69$ 24,500$ 80above 2contracts)W. V. Ward,Joe12-22-6712-22-698,000Et Al.Mrs. EthelJoe6-7-686-7-694,000GodwinJoe (sale ofSLC4-10-696-1-69122,960110,960above 2contracts)1969 Profit on Sale of Timber Contracts$ 111,040Tommy M.Joe12-12-686-12-70$ 800TurnerHerold E.Joe12-17-686-17-70200 ($ 25 perJohnsonthousandboard feet)CurtisJoe1-6-697-6-703,500CulpepperHerbert W.Joe1-8-697-8-703,000BelzNorma EllisJoe1-31-691-31-703,000BishopMrs. W. M.joe2-18-692-18-701,000MizzleL. G. FarrisJoe2-21-692-21-715,000W. E. LaPeyreJoe3-11-693-11-716,500Heirs of MaryJoe4-11-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,000DouglasB. D.Joe4-11-694-11-701,000Peshell, Jr.1B. D.Joe4-11-694-11-702,200Peshell, Jr.n1M. KangergaJoe5-27-695-27-708,010Stone (saleSLC1-19-70(as above53,0003,790of above 12but nocontracts)later than5-10-70John C.Stone7-21-697-21-701,200WeaverEdgarStone7-24-694-28-701,500AlbrightCelia BrannanStone10-23-6910-23-702,200Stone (saleSLC4-1-70(as above4,9000of above 3but nocontracts)later than6-30-70)E. E.Stone9-6-699-6-718,500AlexanderStone (saleSLC6-3-706-30-708,5000u0$ /of abovecontract)1970 Profit on Sale of Timber Contracts$ 3,790*285 Joe had purchased shares of stock over many years but his decisions generally proved to be ill-advised. During 1969 and 1970 Joe was involved with the oil business. In 1969 he did not receive any income from his oil operations but incurred expenses of $ 1,372.36, of which $ 1,334.46 was for expired oil leases. In 1970 Joe received oil royalty income of $ 11.33. This activity did not demand much of Joe's time. Joe, during 1969 and 1970, had some cattle in the feedlot at Eagle Pass, Texas. Some of the cattle were owned jointly with his brother Charles. This activity also did not involve much of Joe's time. During 1970 Joe was a partner in a partnership and a stockholder in an electing small business corporation which raised catfish and incurred reported losses of $ 12,476.08. Joe purchased timber contracts as he became aware of tracts of timber that were for sale. He did not attempt to acquire contiguous tracts since in his view this in itself had no value. He used mostly borrowed capital*286 and bought his timber contracts during his noworking hours. Although the time required to purchase a timber contract varied with each tract, one or two hours generally was sufficient time. All of his purchases of timber contracts involved tracts of timber which were located within counties in the area around Marshall. Prior to purchasing a timber contract Joe generally looked at the tract of timber that was for sale, which sometimes took 15 minutes after locating the tract. When he was unable to see the tract himself, he relied on his past knowledge of the tract involved or on the judgment of someone who had knowledge of the tract and in whom he had confidence. Joe was not a member of any brokers association. He did not list himself as a broker in the telephone directory or in trade directories and did not advertise that he was a broker. There was no office or place of business that he used to purchase and sell timber contracts. Joe had no employees or agents to locate tracts of land on which he could purchase timber contracts or to solicit the purchase and sale of timber contracts. He had not applied for nor been issued a license to buy and sell timber contracts. After Joe purchased*287 his first timber contracts, he approached Robert to sell his contract rights to SLC. After the initial sale to SLC, Robert was aware that Joe was buying timber contracts and had some to sell. When SLC purchased timber contracts from Joe the price was based on Joe's and Robert's separate estimation of the amount of board feet and the current market price. In 1970 Joe stopped buying timber contracts due to the rising cost of borrowing and decrease in construction and demand for lumber. He sold all his timber contracts at that time and had not purchased anymore as of the date of this trial. Joe bought and sold timber contracts based on his own judgment. He was not a partner with Charles, Ronald, or Elliott and was unaware of how much timber they sold to SLC. In February 1974 Joe was in the cattle business. Joe and LaJuan Snider reported the income from the sale of timber contracts as capital gains in their Federal income tax returns for the calendar years 1969 and 1970. In the notice of deficiency respondent determined that the gain was ordinary income under section 1221(1). 4. RonaldRonald, the brother of Elliott and cousin of Charles and Joe, having left college in*288 early 1963, entered into the partnership, Snider Lumber Company. On its termination and the sale of its assets to SLC, Ronald was employed by SLC to supervise the sawmill and log yard. His duties were to cut logs into green lumber, with the oldest logs being processed first, and to supervise as many as 40 to 50 men operating two shifts. None of his duties included locating tracts of timber for SLC. For his services he drew a salary of $ 10,155.60 and $ 5,273.10 for 1969 and 1970, respectively. Having found a tract of timber for a price he considered reasonable, Ronald purchased his first timber contract in 1964 which he ultimately sold to the partnership for a profit. This was his only purchase of a timber contract during that year but he purchased others during 1966 through early 1970. In 1968 Ronald and Elliott entered into a joint venture and bought a timber contract, dated July 12, 1968, on a tract of timber which was commonly known to have been available for purchase for 2 or 3 years but for which buyers had not been willing to pay the price being asked. Ronald realized the market price had been rising and he anticipated that it would continue to rise. Furthermore, he was*289 aware that the tract could be logged in any weather conditions. The primary period to be specified in the timber contract was almost 18 months with an extension of 6 months for inclement weather. Ronald and Elliott had made profits on past sales. Ronald bought two contracts jointly with Elliott since, if they were to lose capital, the loss would be spread between them. Although Ronald and Elliott encountered some difficulty borrowing the necessary funds from local banks to purchase this particular timber contract, the bank did lend them the funds and they purchased the timber contract. No improvements were made on this tract of land to increase the value of the contract. The increased demand for lumber, the unusually wet weather and SLC's need for logs enabled Elliott and Ronald to make a substantial profit when they sold this timber contract to SLC in 1969. Ronald and Elliott jointly bought a timber contract in 1969 from the Fort Worth National Bank, which was acting as an agent for the landowners. Ronald found Elliott's participation essential to their joint purchases as the bank was unwilling to extend credit to Ronald in the amounts he needed to enable him to buy these particular*290 timber contracts. Timber contracts were bought and sold occasionally by Ronald under his registered assumed name of John A. French (French). Ronald made sales of timber contracts during 1969 and 1970 as follows: Ronald L. Snider a/k/a John A. French (French)PrimaryConsiderationConsiderationDate ofExpirationPaid forReceived forEnteringDate ofPurchase ofSale ofFromToContractContractContract(Contracts)ProfitW. E.Ronald4-12-684-12-69$ 2,800RichburgAmbassadorRonald4-23-684-23-691,000CollegeRonaldSLC1-2-694-1-69$ 13,000$ 9,200(sale ofabove 2contracts)BenRonald7-7-697-7-704,200GoodwinRonaldElliott7-7-697-7-704,2000(sale ofabovecontract)Jack Hogg,Ronald &7-12-6812-31-691 32,000Et Al.Ronald andSLC3-1-696-30-69161,40064,700Elliottfor(sale ofabovecontract)each ofthem1969 Profit on Sale of Timber Contracts$ 73,900H. F.Ronald12-2-686-2-70$ 3,500Allison,Et Al.Mrs. V. E.Ronald1-23-691-23-701,950ToddH. B.Ronald1-25-691-25-701,500HowardRobert C.Ronald1-28-691-28-705,000Potter, EtUx.H. L.Ronald4-24-694-24-70150BishopOdessaRonald5-1-695-1-705,000Duffy, EtAl.J. E.Ronald5-5-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,000Reynolds,Et Ux.FrenchSLC1-7-70(as above$ 50,000$ 22,900(sale ofbut noabove 7contracts)later than5-27-70)Ft. WorthElliott6-21-696-1-7027,200.50 forNational&Bank,AgentRonaldeach of themFrenchSLC5-4-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,200.500(sale ofone-halfof abovecontract)Michael D.French9-18-699-18-712,500GollobR. O.French5-26-705-26-722,000GlazeFrenchSLC6-1-706-30-704,5000u0 (sale ofabove 2contracts)1970 Profit on Sale of Timber Contracts$ 22,900*291 During 1970 Ronald sold all of his timber contracts, some at cost, as he thought the market price was going to fall and he wanted to get back the substantial amount of borrowed capital he had used to purchase the timber contracts he had. He was influenced to sell by his recent divorce and SLC's reduced hours of operation. SLC had been operating on two 10-hour shifts which had first been reduced to one shift and then increased to two 8-hour shifts. Ronald had not purchased or sold a timber contract from 1970 to the date of this trial. Due to SLC's net deficit upon its liquidation in mid-1970 Ronald failed to receive $ 14,721.18 on account of his sales of timber contracts to SLC during that year. His loss was reported on his return for 1970 as a "nonbusiness bad debt." Ronald did not advertise that he was a broker or list himself in telephone books or industry*292 directories as a buyer or seller of timber contracts. He had no regular place of business from which he bought and sold timber contracts. He had no facilities to cut and haul timber other than Amy, Inc., a corporation owned by Ronald and Elliott. Amy, Inc. was located in Louisiana and primarily processed pulpwood for paper mills. Ronald did not subscribe to any industry publications, nor was he a member of an industry association. He had no license to buy and sell timber contracts. He had no employees, partners or agents soliciting the purchase and sale of timber contracts other than the two that he had purchased with Elliott. Ronald had some oil operations in 1969. He reported expenses of $ 30,836, of which $ 1,334 were for expiration of oil and gas leases. Snider Lumber Company, Lumber Division, a corporation owned by Ronald and Elliott, Purchased in 1971 through its agent, Ronald's and Elliott's father, the assets of SLC and began operating a general lumber business. Ronald reported the income from the sales of his timber contracts as capital gains in his Federal income tax return for the calendar years 1969 and 1970. In the notice of deficiency respondent determined that*293 the gains from these sales were ordinary income under section 1221(1). 5. ElliottPrior to entering college, Elliott was in the cattle business. He attended college for 3 years after which he entered into the partnership, Snider Lumber Company, along with his brother Ronald and cousins Charles and Joe. Upon its termination in January 1966, he was employed by SLC to supervise its logging operations, including the cutting and hauling, which were the same functions he had performed for the partnership. As many as 100 men were involved with logging. Although his duties were not necessarily to locate tracts of timber for SLC, he did occasionally become involved with the purchase of timber contracts for the corporation. Robert determined what amount he was willing to pay for a timber contract on a particular tract of land and directed Elliott to purchase it for SLC if he could for less than that amount, but in no event for any more than that amount. Elliott's working hours were usually 7 a.m. to 6 p.m., 5 days a week. For his services SLC paid Elliott a salary of $ 10,665.20 in 1969. During 1969 Elliott devoted some time to his oil operations from which he reported expenses of*294 $ 1,786, of which $ 1,334 were for expired oil and gas leases. Elliott bought his first timber contract in 1966, believing the price of timber would rise, after he had been asked if he wanted to buy it for a price that he thought was reasonable. He bought and sold timber contracts at a profit to himself from 1966 through mid-1970. In his purchase and sale of timber contracts he sometimes used his registered assumed name of Joe T. Logan (Logan). Elliott participated with Ronald in the purchase of two timber contracts, the details of which have been heretofore stated. His sales of timber contracts during 1969-1970 were as follows: zzzElliott P. Snider a/k/a Joe T. Logan (Logan)PrimaryConsidera-Considera-tiontionDate ofExpirationPaid forReceivedforEnteringDate ofPurchaseSale ofofFromToContractContractContract(contracts)ProfitZ. T. Craver 1Elliott11-28-67$ 1,750Z. T. Craver 1Elliott1-19-686-13-693,000R. F. DavisElliott4-3-684-3-69200John O.Elliott4-11-684-11-692,500Hendrick, Sr.Elliott (saleSLC2-1-69(as above but noof above 4contracts)later than 6-30-69)$ 27,500$ 20,050Jack Hogg, EtRonald &7-12-6812-31-692 32,000Al.ElliottRonald andSLC3-1-696-30-69161,40064,700Elliott (saleforof abovecontract)each ofthem1969 Profit on Sale of Timber Contracts$ 84,750Mrs. B. A.Elliott1-6-695-6-70$ 4,000FloydCarlton EllisElliott1-31-691-31-701,250Addison F.ElliottFeb. 1969Mar. 19702,100FloydMrs. JohnElliott2-21-692-21-704,300BirdwellMrs. N. J.Elliott3-29-693-29-701,550HarrisonNorma EllisElliott4-2-694-2-704,600Neil BeasleyElliott4-10-694-10-703,500Logan (sale ofSLC1-14-70(as above but no$ 64,000$ 42,700above 7contracts)later than 5-6-70)Ft. WorthElliott6-21-696-1-7027,200.50National Bank,&forAgentRonaldeach ofthemRonaldElliott7-7-697-7-704,200Mrs. C. R.Elliott7-12-697-12-703,400Taylor 3C. R. Taylor 3Elliott7-12-697-12-70925Logan (sale ofSLC5-4-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,725.5000-above 3contracts andone-half of Ft.Worth contract)J. O. and HenryElliott9-19-693-19-713,960H. Brown 4J. O. and HenryElliott1-26-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,400H. Brown 4Logan (sale ofSLC6-5-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,36000-above 2contracts)1970 Profit on Sale of Timber Contracts$ 42,700*295 Elliott purchased some timber contracts over the telephone and others in person on weekends or as the occasion fortuitously arose. He sold his timber contracts to SLC while he was at work on its premises. Since mid-1970 Elliott has not purchased any timber contracts for his own account. SLC failed to pay for the timber contracts it bought from Elliott in 1970 to the extent of $ 33,650.29. Elliott did not advertise and did not list himself in telephone directories or trade directories as a broker. He did not solicit the*296 purchase and sale of timber contracts other than his first sale to SLC. He was not a member of an industry association and did not subscribe to industry publications. He held no license to be a broker nor had he applied for one. He had no agents or employees soliciting the purchase and sale of timber contracts. In their Federal income tax returns for the calendar years 1969 and 1970 Elliott and Frankie Snider reported the income from the sale of timber contracts as capital gain. In his notice of deficiency respondent determined the gain was ordinary income under section 1221(1) for each year. OPINION Section 1221(1)3 provides that a capital asset does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." *297 Petitioners contend that their timber contracts were held by them as an investment and were not property held primarily for sale to customers in the ordinary course of their trade or business. They argue that a timber contract is analagous to a commodity futures contract as title passes only to that timber which is severed within the specified time under the terms of the timber contract, relying on Commissioner v. Covington,120 F. 2d 768 (C.A. 5, 1941), certiorari denied 315 U.S. 822, affirming in part and reversing in part 42 B.T.A. 601 (1940), and other similar cases. Moreover, petitioners argue, although they purchased timber contracts with the intent to resell them at a time when they could make a satisfactory profit, the contracts were acquired for the purpose of appreciation in anticipation of an increase in market value and not for selling in a trade or business. They argue that under our holding in William B. Howell,57 T.C. 546 (1972), the gain realized when such property is sold is capital gain and not ordinary income. Petitioners assert that they engaged in no activity in their purchase and sale of timber*298 contracts which was characteristic of a timber broker, that they performed no significant activity with respect to making improvements of the timber contracts which they held, that they made few sales and those which were made were intermittent and occasional, that their sales activity was limited, that they devoted insignificant amounts of time to buying and selling timber contracts, and that they performed no merchandising services for which they were compensated by the substantial gains they realized. Respondent's position is that the timber contracts held by petitioners were held by them primarily for sale to customers in the ordinary course of petitioners' trade or business. He relies on the fact that petitioners' purpose in acquiring timber contracts was to resell them and the limited duration of the contract rights under the terms of the contracts that they acquired, as well as the frequency, continuity, and substantiality of petitioners' purchases and sales from 1966 to 1970, inclusive, as indicative of sales in the ordinary course of a trade or business under the holding in Real Estate Corporation,35 T.C. 610 (1961), affd. 301 F. 2d 423*299 (C. A. 10, 1962), certiorari denied 371 U.S. 822 (1962), rehearing denied 371 U.S. 917 (1962). Respondent further argues that his conclusion is supported by the fact that petitioners' substantial and principal source of income in 1969 and 1970 was from sales of timber contracts and that petitioners' expert skills in the buying and selling of the contracts was utilized. Respondent argues that petitioners' lack of sales promotion and activity is not indicative of the sales being of a capital asset since this lack of activity resulted from an available solicitous buyer, relying on United States v. Winthrop,417 F. 2d 905 (C.A. 5, 1969). Respondent distinguishes timber contracts from commodity futures on the basis that the former under Texas law prior to 1974 is a contract to sell, the sale being effectuated only upon the severance of standing timber from the land, whereas the latter is a present sale requiring subsequent delivery. Further, respondent points out that a timber contract must be drafted and transmitted to the buyer and may be recorded in the county realty records. Whether the timber contracts which were purchased and sold*300 during 1969 and 1970 by each of petitioners were held by each of them primarily for sale to customers in the ordinary course of that petitioner's trade or business, thereby excluding the realized gains from capital gains treatment, requires a factual determination. This fact question must be resolved on the basis of an objective rather than a subjective approach. Robert W. Pointer,48 T.C. 906, 915 (1967), affd. 419 F. 2d 213 (C.A. 9, 1969); W. T. Thrift, Sr., 15 T.C. 366 (1950). Each petitioner has the burden to prove the negative and show that during 1969 and 1970 he was not engaged in the timber brokerage business and was not selling timber contracts held by him primarily for sale to customers in the ordinary course of such trade or business. S. O. Bynum,46 T.C. 295, 298-299 (1966). Factors that are generally considered in determining whether the gain arose from the operation of a trade or business or from a series of investments include the purpose for which the asset was acquired, the frequency, continuity, and size of*301 sales and purchases, the activities of the seller in the improvement and disposition of the property, the extent of improvements made to the property, the proximity of sale to purchase, and the purpose for which the property was held during the taxable years. William B. Howell,supra at 554. See Smith v. Dunn,224 F. 2d 353, 356 (C.A. 5, 1955). Other factors which are frequently considered, when pertinent, include the relative amounts of income from the taxpayer's regular business and from the sales transactions and the regularity and consistency of the taxpayer's activity. Robert L. Adam,60 T.C. 996, 999 (1973). Although previously decided cases involving section 1221(1) are helpful, they are not decisive and no one factor is determinative since each particular case depends upon its own precise facts and circumstances. W. T. Thrift, Sr.,supra at 369; Robert L. Adam,supra at 1000. Consideration of the various factors is to be made on the premise of a business "as an ongoing enterprise systematically conducted, designed to produce a profit, to which the entrepreneur or his agents devote substantial time, skill and resources. *302 " Westchester Development Co.,63 T.C. 198 (1974). In determining whether under the circumstances of this case each of petitioners held the timber contracts primarily for sale to customers in the ordinary course of his trade or business, we recognize that the preferential capital gains treatment, being an exception to the normal tax rates, is to be construed narrowly and that the statutory purpose of section 1221(1) "is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand ( Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52) and 'the realization of appreciation in value accrued over a substantial period of time' on the other. ( Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134). [Citations omitted.]" Malat v. Riddell,383 U.S. 569, 572 (1966). Charles transacted 2 sales in 1969 for a profit of $ 69,210, comprising 10 timber contracts that he had purchased in 1968, of which 5 were significantly related to 2 such purchases. Charles made*303 four sales in 1970, only one of which resulted in a gain and that was in the amount of $ 34,155. Two of these sales disposed of 3 timber contracts that he had purchased in 1968, of which 2 were significantly related to one such purchase, and 13 timber contracts that he had purchased in 1969. The remaining two sales in 1970 were portions of one timber contract that he had purchased that year and resulted in no profit. Even if related purchases are separately considered, Charles entered into 15 transactions in 1969 and 5 in 1970, and at least 13 in 1968. Except for 7 months of the period from April 1968 through January 1970, Charles transacted at least one purchase or sale. Only 2 of the 7 months in which no transaction occurred were consecutive. The number of separate transactions during this 22-month period was an average of 1-1/3 per month, or a total of 29 such transactions. Additionally Charles made an undetermined number of purchases and sales of timber contracts during 1966 through 1968. Charles made no purchase or sale of a timber contract during June, August, September, November, December, 1969, and during all of 1970 except for January, April, and June. While the record is*304 not altogether complete, it appears that during the last 10 months of 1968 he did buy a timber contract during each month except for July and November. Joe made two sales in 1969. The first sale involved two timber contracts which were purchased in 1968 and resulted in a gain of $ 80. The second sale conveyed two timber contracts, one of which he had purchased in 1967 and the other in 1968, for a gain of $ 110,960. Joe made three sales in 1970. The first of these sales transferred 2 timber contracts that he had purchased in 1968 and 10 timber contracts that he had purchased in 1969, of which 2 were significantly related to one purchase transaction. His gain from this sale was in the amount of $ 3,790. The remaining two sales in 1970 involved four timber contracts purchased in 1969 and neither sale resulted in a gain. Joe completed 16 transactions in 1969, 3 in 1970, and at least 5 in 1968. His purchases and sales occurred at least once monthly from December 1968 to January 1970, inclusive, except for 4 months only 2 of which were consecutive. During this 14-month period Joe completed 19 transactions, averaging approximately 1-1/3 each month. Joe also purchased and sold an indeterminate*305 number of timber contracts during 1966 through 1968, but he did not engage in the purchase or sale of a timber contract during June, August, October, November, and December 1969, and during all of 1970 except for January, April, and June. Further, it appears from the record which is not quite complete that Joe did not buy a timber contract during 6 of the last 10 months of 1968. Ronald and Elliott participated in the joint purchase of a timber contract in 1968, a portion of which they jointly sold during that year and the remainder in the following year for a profit of $ 129,400, which they shared equally. During 1969 Ronald entered into another sale in which he sold two timber contracts that he had purchased in 1968 and realized a gain of $ 9,200. His only other transaction during 1969 was the purchase of a single timber contract which he immediately sold to his brother for no gain. During 1970 Ronald made three sales, only the first of which realized a gain. His first sale on which his gain was $ 22,900 conveyed a contract that he had purchased in 1968 and six contracts he had purchased in 1969. The last two sales for 1969 were at cost. These two sales involved a sale of a single*306 timber contract he and his brother jointly acquired in 1969 and a sale of a timber contract that he had acquired in 1969 and of another he had acquired in 1970. Summarizing, Ronald participated in the purchase or sale of 12 timber contracts in 1969 and 4 in 1970, and at least 5 in 1968. During the period December 1968 to September 1969, inclusive, Ronald completed at least one transaction in each month except for two nonconsecutive months. During this same 10-month period he bought or sold 13 timber contracts to average 1-1/3 per month. Additionally he purchased and sold timber contracts during 1966 through 1968. But Ronald did not enter into any transactions during February, August, October, November, and December 1969, and all of 1970 except for January, May, and June. While it is not absolutely clear from the record, it appears that he made no purchases of timber contracts during January, February, March, May, June, August, October, and November 1968. In addition to his joint sale during 1968 and 1969 of a timber contract he had acquired with his brother, Ronald, Elliott entered into one other sale during 1969 from which he realized a gain of $ 20,050. This involved the disposition*307 of a timber contract he had purchased in 1967 and three contracts he had purchased in 1968. During 1970 Elliott transacted three sales. The first of these conveyed his interest in seven contracts he had purchased in 1969. This was his only profitable sale for 1970 and he realized a gain in the amount of $ 42,700. His second sale involved the disposition of four contracts he had purchased in 1969 of which two were related to one purchase. The last sale disposed of a contract purchased in 1969 and another purchased in 1970. Elliott completed 14 transactions in 1969 and 4 in 1970, and at least 5 in 1968. From January to September 1969, inclusive, Elliott executed the purchase or sale of 14 timber contracts to average approximately 1-1/2 per month. During this 9-month period Elliott failed to transact a single sale or purchase in only 2 months, which were nonconsecutive. Additionally, Elliott bought and sold an unknown number of timber contracts during 1966 through 1968. He did not buy and sell any timber contracts during May, August, October, November, December 1969, and during all of 1970 except for January, May, and June. It is reasonably clear from the record that he did not buy any*308 timber contracts during February, March, May, June, August, October, November, and December 1968. Except in one instance in which Ronald sold a timber contract to Elliott on the same day he purchased it, petitioners, with respect to a single sale, sold only those timber contracts that they held for longer periods of time and retained those that they had more recently purchased although they were available to sell and were ultimately sold at a later date. Petitioners realized gains on their sales until late January 1970. Petitioners each made sales to SLC during the periods of March 1 to April 10, 1969, January 1970, April 1 to May 4, 1970, and June 1970. Initially we note that respondent does not contend that petitioners acted in concert with one another so that each petitioner's activities with respect to his timber contracts would be attributed to the others. Respondent recognizes that each petitioner's activities must be viewed separately. We recognize, as respondent argues, that the issue here differs from the issue involving whether a taxpayer was a trader for his own account or a dealer in securities, futures contracts and whiskey warehouse receipts on an established or*309 informal exchange involved in such cases as Commissioner v. Convington, supra, and Thomas E. Wood,16 T.C. 213 (1951). In this case petitioners were not trading over a formal or informal exchange and, therefore, the holding of such cases as Thomas E. Wood,supra, and O. L. Burnett,40 B.T.A. 605, 609 (1939), affd. in part and reversed in part on another ground 118 F. 2d 659 (C.A. 5, 1941), that no amount of trading on an established exchange is a sale to "customers" in the ordinary course of trade or business is not pertinent to this case. However, applying the principles in cases involving whether property not sold on an exchange is held primarily for sale in the ordinary course of a taxpayer's trade or business, we conclude from the facts here that none of the timber contracts involved were so held by petitioners. Clearly petitioners held the contracts for sale. In fact they had to sell these contracts prior to their expiration, which was generally within a year or a little over of their acquisition, unless they or someone acting on their behalf severed the standing timber from the ground or the primary period under*310 the contract was extended by the grantor. None of petitioners themselves had the capacity to cut the standing timber located in and around Marshall and there is no evidence that they intended to have someone cut it for them. Petitioners had no assurance that their grantors would willingly give an extension for no consideration and there is no evidence of their having obtained an extension. However, the holding of property for sale does not remove that property from the definition of a capital asset unless the property is held for sale in the ordinary course of a taxpayer's trade or business. Therefore, unless we conclude from the record that each petitioner was in the "trade or business" of selling timber contracts, the sales made by each petitioner are of capital assets. After carefully scrutinizing the entire record, we have concluded that none of petitioners was in the trade or business of selling timber contracts. In Real Estate Corporation, supra, on which respondent relies, this Court concluded that the taxpayer's activities constituted a trade or business, relying on evidence showing: (1) 17 sales transactions involving an average of 70 unimproved lots*311 in each of the three years at issue; (2) net sales income accounting for approximately 75 percent of the taxpayer-corporation's total net income for each of these years; (3) that a significant amount of the taxpayer's activity was devoted to buying and selling; (4) that the taxpayer acquired and held property with the expectation of selling as soon as a reasonable profit could be realized; and (4) the taxpayer's purchases during these three years were continuous. In that case and in most other similar cases where courts have concluded that the activity of the taxpayer constituted a trade or business and the frequency and continuity with which the activity was carried on has been relevant, there have also been present substantial elements of time and effort spent in developing or selling the property. See Frieda E. J. Farley,7 T.C. 198, 202 (1946), where we stated with respect to the weight to be given to "frequency and continuity" in determining whether a taxpayer was engaged in a trade or business: It is significant to note, however, that the cases which have applied this test to real estate transactions involved elements of development and substantial sales activity*312 which are essentially lacking in the instant case. Compare Curtis Co.,23 T.C. 740, 753 and 755 (1955), affd. in part and reversed in part on other grounds 232 F. 2d 167 (C.A. 3, 1956), where the frequency, continuity, and substantiality of sales were to some extent accompanied by or associated with a sales effort of the taxpayer. In Robert L. Adam,supra, we concluded the taxpayer was not in the trade or business of selling undeveloped real estate, although he entered into 20 transactions during a 4-year period and held each property only an average of 11 months. While the facts in this case involve more purchases by each petitioner over a longer period of time than in the Adam case, each petitioner in this case made fewer sales than the taxpayer in the Adam case. In our view the facts here as to number of transactions is not significantly different from those in the Adam case. Except for the brief period during a portion of 1968 and the first 9 months of 1969, petitioners' transactions were not continuous but intermittent or even at times sporadic. Ronald, Joe, and Elliott entered into no transactions during*313 the last 3 months of 1969 and Charles similarly failed to transact any purchase or sale during 4 of the last 5 months of that year. None of petitioners made a sale or a purchase during 9 of the 12 months in 1970. While the record is unclear with regard to 1966 through 1968, it appears that during 1968 petitioners each made a few sales but only made approximately 5 purchases, except for Charles who made approximately 13. In our view, under the circumstances of the instant case the number of purchases and sales of each petitioner is not so frequent or continuous as to indicate that each of petitioners was in his own trade or business. Fahs v. Crawford,161 F. 2d 315 (C.A. 5, 1947); Ralph J. Oace,39 T.C. 743, 748 (1963). Moreover, as this Court recognized in Robert W. Pointer,supra at 917, the frequency of a taxpayer's purchases and sales of property is a difficult measure and the decided cases which have involved a widely differing number of sales have not always been consistent. In Pointer, rather than applying a mechanical test, this Court considered whether the taxpayer was engaged in activity commonly associated with the particular*314 business. The facts of this case indicate that the number of petitioners' sales and their activity in making those sales would not be comparable to those made by persons in the timber brokerage business. Petitioners devoted insignificant amounts of time, attention and effort to their purchases and sales of timber contracts. It only took several hours to purchase a timber contract and less to sell one. Petitioners were all salaried full-time employees during 1966 through mid-1970. The time that they did engage in purchasing and selling was not only limited but also irregular. Most of their negotiations were conducted at times other than during their working hours and resulted from information which had fortuitously been brought to their attention. None of petitioners made any improvements to the land on which stood the timber that they had the contract right to cut and haul or any improvements to the contract itself that would facilitate its sale. Petitioners had no aggressive sales campaign to dispose of timber contracts. They did not advertise that they bought timber contracts or had timber contracts available for sale. They did not actively solicit the purchase and sale of timber*315 contracts, other than their initial solicitation of Robert to make known to him that they had timber contracts to sell if SLC wanted to purchase them. They had no offices or usual place of business. They did not hire anyone or contract for the services of any person to solicit for them the purchase and sale of timber contracts. We recognize that it has been held that lack of advertising is not important when it is unnecessary for a taxpayer to advertise extensively because of a seller's market, especially where there is a limited number of buyers and there are repeated purchases made by one particular buyer. However, in this case, had each of petitioners been actively engaged in a business of purchasing and selling timber contracts, more sales-related activities with the increasing demand for standing timber during 1966 through 1969 would have enabled far more extensive activity on their part. We therefore conclude that on the facts here present the lack of such activity indicates that petitioners were not conducting a business but rather were holding their timber contracts as investments for*316 appreciation in value. In comparing petitioners' salary income and their profits from the sale of timber contracts, each one's profits exceeded his individual income by 700 to 1,100 percent for 1969 and by 400 to 800 percent for 1970, except for Joe who had more earned income than profits from sales during 1970. However, we have not found this factor persuasive as it is the consequence of the very high return in a short period of time on the amounts that petitioners paid for the timber contracts they purchased. In William B. Howell,57 T.C. 546 (1972), the corporate seller's only income during its existence was from its sales of property and the absolute gain was greater than that of each petitioner in the instant case, but we did not consider the facts to be persuasive that the property was held for sale in the ordinary course of a trade or business. Here, the record is even stronger that the large proportion of petitioners' income in the years here in issue which came from sales of timber contracts does not indicate that any of petitioners were in the trade or business of selling such contracts. The reversal of petitioners' fortunes from phenomenal profits in*317 1969 to no profits after January 1970 and the rise in demand for lumber from 1966 until 1970 when it leveled off indicates that the increase in value of the timber contracts did not result from any activities of petitioners but was attributable solely to the prevailing market value for timber contracts. Prior to their learning of SLC's impending failure, petitioners had ceased buying any timber contracts. They purchased only two timber contracts after October 1969 and only one of these was after it was known that SLC was going out of business and this purchase was induced more to satisfy an obligation of Charles' than to provide SLC with materials. The contraction of petitioners' holdings prior to SLC's known demise indicates each petitioner was not operating a day-to-day business of supplying SLC with raw materials, although SLC purchased approximately 1/4th of its standing timber from petitioners in 1969, but was speculating in the timber market. When they thought the market was becoming soft, they reduced their purchases in late 1969 and virtually ceased them in 1970 in anticipation of the market's decline. While petitioners intended to resell the timber contracts when they had*318 appreciated in value to such an extent that they could make a satisfactory profit, their sales involved only those timber contracts that they had held for the longest period of time and which were closest to expiration. Petitioners all believed that the value of standing timber was going to increase and bought timber contracts to realize their expectations of this appreciation. Although petitioners knew that they had to sell their timber contracts within 1 to 2 years after their purchase, in our view their intent was to hold them as long as they could under the circumstances with the hope of their ultimate enhancement in value. Petitioners' ultimate intention of reselling the timber contracts and their sale are by themselves insufficient to require a determination that petitioners were in the timber brokerage business and that their sales of timber contracts were in the ordinary course of that business. William B. Howell,supra at 555; Wellesley A. Ayling,32 T.C. 704, 709-710 (1959). After considering all the factors involved and the record as a whole, we conclude that each petitioner's sale of timber contracts during 1969 and 1970 was not in the ordinary*319 course of his trade or business. Accordingly, we hold that the timber contracts held by each petitioner were not held by him primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 1221(1) and each petitioner's gains from these sales were capital gains. Although we decide the only issue present for petitioners, because of adjustments made in the notice of deficiency which were not contested, Decisions will be enteredunder Rule 155.Footnotes1. Cases of the following petitioners are consolidated herewith: Joe A. Snider and LaJuan Snider, docket No. 8127-72; Ronald L. Snider, docket No. 8128-72; and Elliott P. Snider and Frankie Snider, docket No. 8504-72.↩2. All references are to the Internal Revenue Code of 1954.↩1. Same witness to contracts and identical contractual provisions except for amount of consideration, size of tract, and kind of timber involved. ↩2. Same witness to contracts and identical contractual provisions other than size of tract, amount of consideration, and slight variation in legal description of location of tract. Same notation of $ 600 + $ 750 + $ 550 = $ 1,900 on each contract. Tracts involved are located in same county. ↩3. No witness to contracts and same contractual provisions other than size of tract, amount of consideration, and description of location of property although tracts involved are located in the same county. Notation on Mrs. Calloway's contract of $ 8,600 + $ 8,300 = $ 16,900. ↩4. Tracts involved are located in same county and survey. Contracts were executed on the same date.↩1. These timber contracts involve the same contractual provisions other than size of tract and type of timber and restrictions on removal. The same witness attested to both contracts.↩1. Ronald and Elliott actually paid $ 40,000 ($ 20,000 each) for the Hogg tract contract. However, Ronald and Elliott sold a portion of their contract rights with respect to the Hogg tract to Newton-Shank Mfg. Co. on September 12, 1968, for $ 8,000 ($ 4,000 each), thereby reducing their basis to $ 32,000 ($ 16,000 each).↩1. Z. T. Craver had purchased the timber contract from the fee owner. ↩2. Elliott and Ronald actually paid $ 40,000 ($ 20,000 each) for the Hogg tract contract. However, Elliott and Ronald sold a portion of their contract rights with respect to the Hogg tract to Newton-Shank Mfg. Co. on September 12, 1968, for $ 8,000 ($ 4,000 each), thereby reducing their basis to $ 32,000 ($ 16,000 each). ↩3. These timber contracts involved the same kind of timber and the tracts were located in the same county. C. R. Taylor signed Mrs. C. R. Taylor's contract. ↩4. These timber contracts involved the same grantors and contained almost identical contractual provisions.↩3. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * * *↩